# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 15

### OCTOBER TERM, A.D. 2013

### January 28, 2014

KERRY and CLARA POWERS, on behalf of themselves and the citizens of Wyoming, and CINDY HILL, on behalf of herself and as the SUPERINTENDENT OF PUBLIC INSTRUCTION,

Appellants
(Plaintiffs),

v.

STATE OF WYOMING and MATTHEW H. MEAD, GOVERNOR, in his official capacity,

Appellees
(Defendants).

No. S-13-0052

*W.R.A.P. 11 Certification from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellants:*

   *Angela C. Dougherty, Dougherty Law Office, P.C., Cheyenne, Wyoming.*

*Representing Appellees:*

   *Peter K. Michael, Attorney General; John G. Knepper, Senior Assistant Attorney General.  Argument by Mr. Michael.*

*Before KITE, C.J., VOIGT\*, BURKE, DAVIS, JJ., and GOLDEN, J., Retired.*

*BURKE, J., delivers the opinion of the Court; DAVIS, J., files a specially concurring opinion, in which VOIGT, J., joins; KITE, C.J., and GOLDEN, J., Retired, file a dissenting opinion.*

*\*Justice Voigt retired effective January 3, 2014.*

**NOTICE:** This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BURKE, Justice.**

[¶1]   This matter comes before us as four certified questions from the district court for the First Judicial District of Wyoming.  These questions ask us to determine whether Senate Enrolled Act 0001 violates the Wyoming Constitution.  We conclude the Act unconstitutionally deprives the State Superintendent of Public Instruction of the power of "general supervision of the public schools" that is entrusted to the Superintendent in Article 7, Section 14 of the Wyoming Constitution.[1]

## CERTIFIED QUESTIONS

[¶2]   The district court certified four questions to this Court.  However, we find the following question to be dispositive:

> 1. Does Senate Enrolled Act 0001 violate Wyoming Constitution Article 7, Section 14?[2]

## FACTS

[¶3]   Appellant Cindy Hill is the current Superintendent of Public Instruction for the state of Wyoming.  She was elected to serve a four-year term in the 2010 general election.  Appellants Kerry and Clara Powers are Wyoming citizens who cast their votes for Ms. Hill.  In January, 2013, approximately two years after Ms. Hill began serving her

---

[1] Article 7, Section 14 provides as follows:

> **§ 14. Supervision of schools entrusted to state superintendent of public instruction.**
>
> The general supervision of the public schools shall be entrusted to the state superintendent of public instruction, whose powers and duties shall be prescribed by law.

[2] The remaining certified questions are:

> 2.   Does Senate Enrolled Act 0001 violate Wyoming Constitution Article 1, Section 1 and Section 20?
>
> 3.   Does Senate Enrolled Act 0001 violate Wyoming Constitution Article 2, Section 1?
>
> 4.   Does Senate Enrolled Act 0001 violate Wyoming Constitution Article 3, Section 27?

1

term of office, the Wyoming Legislature passed Senate Enrolled Act 0001. The title describes it as "AN ACT . . . establishing the position of director of the department of education by statute; providing duties of the director of the department of education; [and] amending duties of and transferring specified duties from the state superintendent to the director of the state department of education." 2013 Wyo. Sess. Laws ch. 1 (codified at Wyo. Stat. Ann. §§ 9-1-513; 21-1-103; 21-2-104, -105, -201 *et seq.*, -301, -304, -306, -502, -701, -703, -801, -802; 21-3-110, -117, -314, -401; 21-4-401, -601; 21-6-210, -219; 21-13-101, -102, -306, -307, -309, -310, -312, -313; 21-15-113; 21-17-201; 21-18-201; 21-22-103; and 31-5-118).

[¶4]    Prior to enactment of SEA 0001, the Superintendent was the administrative head and chief executive officer of the Department of Education. Wyo. Stat. Ann. § 21-2-201 (LexisNexis 2011). In that capacity, the Superintendent's powers and duties included, among others, the duty to make rules and regulations "as may be necessary or desirable for the proper and effective administration of the state educational system and the statewide education accountability system," and to "[e]nforce the provisions" of the Education Code and the administrative rules and regulations provided for in the Education Code. Wyo. Stat. Ann. § 21-2-202. The 2013 Act removed the Superintendent as the administrator and chief executive officer of the Wyoming Department of Education. The Act created the new position of Director of the Wyoming Department of Education and assigned to the Director nearly all of the duties that were formerly the responsibility of the Superintendent. Wyo. Stat. Ann. § 21-2-202(a) (LexisNexis 2013). The Act amends a total of 36 separate statutes and substitutes "director" for "state superintendent" in approximately 100 places. According to the State, the Act transfers 68 duties from the Superintendent to the Director. The Director is appointed by the Governor. Wyo. Stat. Ann. § 21-1-104.

[¶5]    Under the Act, the Superintendent's enumerated duties are to (1) prepare an annual report for the legislature on "the general status of all public schools;" (2) adopt rules and regulations "as may be necessary for the proper and effective general supervision of the public schools," to the extent that this authority does not conflict with the rulemaking authority of the board of education, department of education, or the director of education; (3) administer a "teacher of the year" program; (4) establish "requirements for school district policies and training regarding the use of seclusion and restraint in schools;" (5) assist local school districts "in developing protocols . . . for addressing risks associated with concussions and other head injuries resulting from athletic injuries;" (6) establish guidelines for school districts for the proper and safe storage and disposal of toxic chemicals and other hazardous substances; and (7) identify professional development needs for Wyoming schools and teachers and conduct up to five regional workshops each year addressing the identified professional development needs. Wyo. Stat. Ann. § 21-2-201. Although the Act transfers the bulk of the Superintendent's previous powers and duties to the Director, the Act retains language in

2

Wyo. Stat. Ann. § 21-2-201(a) providing that "The general supervision of the public schools shall be entrusted to the state superintendent as prescribed by law."

[¶6]    On the day the Act was signed into law, Appellants filed an action in district court seeking a declaratory judgment and preliminary injunction that would prevent the Act from taking effect.  The district court denied the motion for a preliminary injunction and certified the four questions of law to this Court pursuant to W.R.A.P. 11.

## *STANDARD OF REVIEW*

[¶7]    Issues of constitutionality present questions of law.  *Cathcart v. Meyer*, 2004 WY 49, ¶ 7, 88 P.3d 1050, 1056 (Wyo. 2004).  In determining the constitutionality of a statute, we have previously stated that:

> The party challenging the constitutionality of a statute bears the burden of proving the statute is unconstitutional. *Pfeil v. Amax Coal West, Inc.*, 908 P.2d 956, 961 (Wyo. 1995). That burden is a heavy one "in that the appellant must 'clearly and exactly show the unconstitutionality beyond any reasonable doubt.'" *Cathcart v. Meyer*, 2004 WY 49, ¶ 7, 88 P.3d 1050, 1056 (Wyo. 2004), quoting *Reiter v. State*, 2001 WY 116, ¶ 7, 36 P.3d 586, 589 (Wyo. 2001). In our analysis, we presume "the statute to be constitutional. . . . Any doubt in the matter must be resolved in favor of the statute's constitutionality." *Thomson v. Wyoming In-Stream Flow Committee*, 651 P.2d 778, 789-90 (Wyo. 1982).

*Krenning v. Heart Mt. Irrigation Dist.*, 2009 WY 11, ¶ 33, 200 P.3d 774, 784 (Wyo. 2009).  However, we have also recognized that "[t]hough the supreme court has the duty to give great deference to legislative pronouncements and to uphold constitutionality when possible, it is the court's equally imperative duty to declare a legislative enactment invalid if it transgresses the state constitution." *Washakie County Sch. Dist. v. Herschler*, 606 P.2d 310, 319 (Wyo. 1980).  In this case, Appellants present a facial challenge, which is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Director of the Office of State Lands & Invs. v. Merbanco, Inc.*, 2003 WY 73, ¶ 32, 70 P.3d 241, 252 (Wyo. 2003).[3]

---

[3] Appellants contend that our standard of review should reflect that the Act impinges on their fundamental right to vote.  The State, however, asserts that Appellants' challenge is "based on the Wyoming Constitution's division of powers" and that "[c]ases involving fundamental, individual rights, such as free

## DISCUSSION

[¶8]    In cases of constitutional interpretation, "We are guided primarily by the intent of the drafters." *Cantrell v. Sweetwater County Sch. Dist. No. 2*, 2006 WY 57, ¶ 6, 133 P.3d 983, 985 (Wyo. 2006).

> The primary principle underlying an interpretation of constitutions or statutes is that the intent is the vital part, and the essence of the law. (Sutherland Stat. Const., Sec. 234, *People v. Potter*, 47 N.Y. 375.) "The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it. In the case of all written laws, it is the intent of the lawgiver that is to be enforced." (Cooley Const. Lim., 55.)

*Rasmussen v. Baker*, 7 Wyo. 117, 128, 50 P. 819, 821 (1897). As explained at length in *Rasmussen*, in determining that intent we look first to the plain and unambiguous language used in the text of the Constitution:

> Such intent . . . is that which is embodied and expressed in the statute or instrument under consideration. "The intent must be found in the instrument itself." (Cooley Const. Lim., 55; Sutherland Stat. Const., Sec. 234.) If the language employed is plain and unambiguous, there is no room left for construction. It must be presumed that in case of a constitution the people have intended whatever has been plainly expressed. Courts are not at liberty to depart from that meaning which is plainly declared.

*Id.*

[¶9]    More recent decisions interpreting the Wyoming Constitution indicate that we have consistently held to the principle that the language of the text is of primary importance in constitutional interpretation:

> In construing our constitution, we follow essentially the same rules as those governing the construction of a statute. The

---

speech restrictions, simply do not apply." We need not resolve this issue because we find the Act unconstitutional on other grounds.

4

fundamental purpose of those rules of construction is to ascertain the intent of the framers. *Geringer v. Bebout*, 10 P.3d 514, 521 (Wyo. 2000); *Zancanelli v. Central Coal & Coke Co.*, 25 Wyo. 511, 173 P. 981, 991 (1918). "We are charged with discerning the intent of the Constitutional Convention, and we look first to the plain and unambiguous language to discern that intent." *Geringer*, 953 P.2d at 843.

*Director of the Office of State Lands & Invs.*, ¶ 33, 70 P.3d at 252; *see also Cantrell*, ¶ 6, 133 P.3d at 985; *Cathcart v. Meyer*, ¶ 39, 88 P.3d at 1065; *Campbell County Sch. Dist. v. State*, 907 P.2d 1238, 1272 (Wyo. 1995). Further, in interpreting the plain and unambiguous language of the Constitution, we follow harmonizing rules similar to those employed when interpreting statutes.

Our cases explain that every statement in the constitution must be interpreted in light of the entire document, rather than as a series of sequestered pronouncements, and that the constitution should not be interpreted to render any portion of it meaningless, with all portions of it read in pari materia and every word, clause and sentence considered so that no part will be inoperative or superfluous.

*Geringer v. Bebout*, 10 P.3d 514, 520 (Wyo. 2000); *see also Cathcart*, ¶ 40, 88 P.3d at 1065; *Management Council of the Wyo. Legislature v. Geringer*, 953 P.2d 839, 845 (Wyo. 1998). With these rules in mind, we turn to the constitutional provision at issue in this appeal.

[¶10] In this case we are asked to interpret Article 7, Section 14 of the Wyoming Constitution. That section provides:

**§ 14. Supervision of schools entrusted to state superintendent of public instruction.**

The general supervision of the public schools shall be entrusted to the state superintendent of public instruction, whose powers and duties shall be prescribed by law.

While both parties appear to contend that the section is plain and unambiguous, they ascribe different meanings to the section. In doing so, they emphasize different clauses to support their positions.

[¶11] Appellants assert that the words in the first clause, when used in their normal and

customary sense, convey the framers' intent that the Superintendent was entrusted with the responsibility and power to provide supervision of the state public school system. Appellants contend the phrase "whose powers and duties shall be prescribed by law" allows the legislature to "expand or contract" the powers and duties of the Superintendent, but does not permit the legislature to diminish the powers and duties to a level which threatens the Superintendent's power of general supervision. They essentially view the first clause as a restriction on the legislature's authority to prescribe the powers and duties of the Superintendent. Appellants contend the Act is unconstitutional because the legislature has transferred the power of general supervision from the Superintendent, who is elected by the voters, to a director appointed by the Governor. Although the Act specifies that the Superintendent shall have "general supervision," Appellants assert that the phrase, as used in the Act, is essentially meaningless and the purported reservation of the power of general supervision to the Superintendent is illusory. Appellants contend Article 7, Section 14 is plain and unambiguous and that it is not necessary to employ rules of construction to determine the intent of the constitutional framers.

[¶12] The State emphasizes the second clause. It contends the legislature has the ultimate authority to "dictate" the powers and duties of the Superintendent, and that the power of the legislature to "prescribe by law" is unrestricted. It asserts that the constitutionally created office of the Superintendent has no inherent authority, and that the phrase "general supervision" is "more accurately read as a restriction on the Superintendent."[4] According to the State, the phrase "general supervision" is "a grant of limited responsibility and only . . . in areas where no specific supervision is to be had." Although the State does not claim that Article 7, Section 14 is ambiguous, it provides a

---

[4] The State repeatedly asserts that the Superintendent has no inherent authority under the Wyoming Constitution. The State's brief contains the following statements:

> The Wyoming Constitution does not imbue the office of Superintendent with . . . inherent authority over the education of Wyoming children.

> At the Wyoming Constitutional convention, the delegates envisioned an important role for the State Superintendent, but the role was to carry out statutory duties the Legislature would later assign to that office and not to exercise inherent constitutional power over education.

> [T]he meaning of the phrase "general supervision" refutes the assertion that article 7, section 14 of the Wyoming Constitution grants . . . inherent authority to the Superintendent.

> The Superintendent was to "promote in a general way education in this state," not enjoy inherent constitutional power over the education of children throughout Wyoming.

6

detailed legislative history of statutory changes pertaining to the Superintendent, and contends the constitutional debates and legislative history support its position. The State also claims that, even if the legislature's authority to prescribe by law is restricted, the Act is sufficient to survive a constitutional challenge because it explicitly reserves the power of general supervision to the Superintendent, and because the other powers prescribed to the Superintendent are meaningful and significant.

[¶13] Because it is potentially dispositive, we will first address the plain meaning of the phrase "prescribed by law" as it relates to the power of "general supervision" entrusted to the Superintendent in the first clause of Article 7, Section 14. The parties agree that the phrase "prescribed by law" refers to the legislature's ability to pass laws relating to the powers and duties of the Superintendent. As noted above, however, the parties disagree as to whether this power is restricted in any way by the first clause of Article 7, Section 14.

[¶14] The State contends that we long ago determined that the phrase "prescribed by law" provides unrestricted power to the legislature to limit the powers of constitutionally created offices. In making that assertion, the State relies upon our decision in *Mau v. Stoner*, 14 Wyo. 183, 83 P. 218 (Wyo. 1905). In *Mau*, this Court grappled with a constitutional challenge to a statute which allegedly violated Article 5, Section 2 of the Wyoming Constitution, which provides: "The supreme court shall have general appellate jurisdiction, co-extensive with the state, in both civil and criminal causes, and shall have a general superintending control over all inferior courts, under such rules and regulations as may be prescribed by law."

[¶15] According to the State, "the lesson of *Mau* is that the phrase 'prescribed by law' permits the Legislature to establish or to limit duties at its discretion." We disagree. Our precedent has limited *Mau* to the very narrow facts of that case. Additionally, we have made it abundantly clear that the phrase "prescribed by law" does not permit the legislature to interfere with the constitutional and inherent authority of the courts.

[¶16] The statute at issue in *Mau* was challenged on the basis that it violated Article 5, Section 2 of the Wyoming Constitution because it deprived a party of the opportunity to appeal a district court order appointing a "water distributor." We held as follows:

> It is not necessary, however, in this case for us to express an opinion as to whether there is a constitutional right of appeal or review in cases which proceed according to the course of the common law. The statute under consideration provides for a special or summary proceeding unknown to the common law, created by the Legislature for the purpose of affording temporary relief only and to meet immediate emergencies that

7

may arise under it. The Legislature clearly had the power in such a proceeding to declare that the decision of the District Court should be final and deny the right of appeal therefrom. We, therefore, hold that the Legislature in this proceeding had the right to declare the judgment of the District Court final, and that it has done so by the statute under consideration.

*Mau*, 83 P. at 220-21.

[¶17] In reaching that decision we referenced the "as may be prescribed by law" language of Article 5, Section 2 and commented: "We think the expression 'under such rules and regulations as may be prescribed by law' refers to and limits all the powers conferred by the section--in other words, prescribes how the exercise of these powers may be regulated and limited." *Mau*, 83 P. at 220. It is this language that serves as the lynchpin of the State's argument in this case.

[¶18] It was made very clear in *Mau* that the statute at issue involved a proceeding that was intended to grant temporary relief. We have subsequently confirmed that the temporary nature of the relief was critical to our analysis. *See, e.g., Weidenhoft v. Primm*, 16 Wyo. 340, 354, 94 P. 453, 456 (1908) ("That was a proceeding for the appointment of a water distributer, was summary in notice, temporary in character, and to meet an immediate emergency. It was not an action or proceeding to determine the title or ownership of property; but, on the contrary, for the preservation of the rights of the parties temporarily."); *see also State v. Heiner*, 683 P.2d 629, 643 (Wyo. 1984) ("Not only is the case a civil one, but it concerns a specific statute providing for temporary relief and directing that the decision be final with regards to the temporary relief.").

[¶19] More significantly, we have had numerous occasions to discuss the Court's general superintending authority specified in Article 5, Section 2. We have consistently recognized that the authority granted in that provision of the Constitution cannot be abridged by legislative action. Our analysis is perhaps best presented in *White v. Fisher*, 689 P.2d 102 (Wyo. 1984), where we determined that a statute relating to the contents of court pleadings was unconstitutional. We stated:

> The general superintending control over all inferior courts granted to the supreme court by that provision encompasses the authority to prescribe rules of practice and procedure in those courts. More than fifty years ago this court, relying upon previous decisions, concluded that the power of this court to control the course of litigation in the trial courts of this state is quite plenary. S*tate ex rel. Jones v. District Court of Ninth Judicial Dist.*, 37 Wyo. 516, 263 P. 700, 703 (1928).

8

In *Petersen v. State*, Wyo., 594 P.2d 978, [982] (1979), this position was reiterated, and we also said:

> The Wyoming Constitution provides in Article V, Section 2, that the supreme court 'shall have a general superintending control over all inferior courts under such rules and regulations as may be prescribed by law.' It is well recognized that in this jurisdiction the courts have inherent rights to prescribe rules, being limited only by their reasonableness and conformity to constitutional and legislative enactments. *State ex rel. Frederick v. District Court*, Wyo., 399 P.2d 583, 584 (1965), and cases cited. The legislative enactments referred to include those that deal with the substantive rights of persons or the jurisdiction of the court. Matters dealing with procedure, particularly in the minor courts, are entirely within the province of this court.

Even more recently we reaffirmed the inherent right of courts to prescribe rules. *Barnes v. State*, Wyo., 642 P.2d 1263, 1266 (1982).

Both this constitutional provision affording full authority to this court over rules of practice and the inherent power of courts to prescribe rules are recognized by statute in Wyoming. Section 5-2-114, W.S. 1977, provides:

> The supreme court of Wyoming may from time to time adopt, modify and repeal general rules and forms governing pleading, practice and procedure, in all courts of this state, for the purpose of promoting the speedy and efficient determination of litigation upon its merits.

We have made it clear that this statute only supplements the constitution and does not constitute a delegation of rule-making authority from the legislature:

> The State suggests, however, that this court issues rules of practice and procedure through authority delegated by the legislature and, therefore, in the case

of conflict between our rules and the statutes, the statutes control, citing a portion of 2 Sutherland, Statutory Construction, § 36.06 (1973). In a more pertinent portion of the same section the editor observes:

> Where there is constitutional authority for the judicial department of government to issue rules of practice and procedure or if, in the absence of a constitutional provision, such authority is assumed to be an inherent part of the judicial power, then courts which exercise such authority may be regarded as the legislative authority of the state having jurisdiction to enact law on that subject, just as the legislature makes law on the subjects entrusted to its jurisdiction. The rules issued under those circumstances have stature in the hierarchy of law comparable to that of statutes enacted by the legislature, and acts of the legislature on the subject of judicial practice and procedures in such states are invalid for lack of constitutional jurisdiction in the legislature to make such laws on that subject. *Petersen v. State*, Wyo., 594 P.2d 978, 981-982 (1979).
>
> . . .

It is our conclusion that § 1-1-114, W.S.1977, is unconstitutional in the present form. Further we perceive that in any form it would constitute an attempt to prescribe the content of pleadings, a procedural function. The statute is a clear infringement upon the constitutional and inherent power of this court to make rules.

*White*, 689 P.2d at 106-07 (quotation marks omitted); *see also Squillace v. Kelley*, 990 P.2d 497, 501 (Wyo. 1999); *Terry v. Sweeney*, 10 P.3d 554, 558 (Wyo. 2000); *Reynolds v. Bonar*, 2013 WY 144, ¶ 13, 313 P.3d 501, 504-05 (Wyo. 2013).

[¶20]  In sum, the State's reliance upon our decision in *Mau* is misplaced.  The "lesson of *Mau*," and other decisions from this Court interpreting Article 5, Section 2, is that the power of the legislature to "prescribe by law" is not unrestricted.  Laws may be enacted

that do not interfere with the constitutional or inherent authority of the courts. However, statutes that interfere with that authority are unconstitutional. That concept is also applicable to constitutionally created executive branch offices.

[¶21]  In establishing the executive branch of the new state government, the framers of the Wyoming Constitution established the office of the Governor in Article 4, Section 1. The framers then established four other executive branch offices, including the office of the Superintendent, in Article 4, Section 11, which provides:

### § 11. State officers; election; qualifications; terms.

There shall be chosen by the qualified electors of the state at the times and places of choosing members of the legislature, a secretary of state, auditor, treasurer, and superintendent of public instruction . . . .

In addition to creating those offices, the framers also stated in Article 4, Section 12:

### § 12. State officers; powers and duties.

The powers and duties of the secretary of state, of state auditor, treasurer and superintendent of public instruction shall be as prescribed by law.

We have not had occasion to address whether the "as prescribed by law" language in Article 4, Section 12 provides the legislature with unlimited discretion to "dictate" the powers and duties of those constitutional offices. According to the State, however, "if [Article 4, Section 12] were the only one to describe the Superintendent's authority, a constitutional challenge to the 2013 . . . Act would be doomed." This bold assertion rests upon a very shaky foundation.

[¶22]  The majority of courts that have addressed similar language in their constitutions have concluded that the phrase "as prescribed by law" does not permit the legislature to abolish or transfer, either directly or indirectly, the inherent powers of a constitutionally created office. In *Hudson v. Kelly*, 263 P.2d 362 (Ariz. 1953), the Arizona Supreme Court addressed a challenge to a statute that subjected many of the functions of the state auditor, a constitutionally created office, to approval by the newly-created office of the "commissioner of finance." *Id.* at 368. Arizona's Constitution provided that "The powers and duties of secretary of state, state treasurer, state auditor, attorney-general, and superintendent of public instruction shall be as prescribed by law." *Id.* at 365. Based on this provision, the court determined that the state auditor held inherent powers, and the statute stripping the auditor of those powers was unconstitutional. *Id.* at 368. It stated

11

that the legislature "could not denude the office of its inherent powers and duties, even though they had been prescribed by statute, and leave the office as an empty shell." *Id.* "Such attempts," it noted, "have uniformly been denounced by courts of last resort." *Id*. (citing, *inter alia*, *State ex rel. Josephs v. Douglass*, 110 P. 177, 180 (Nev. 1926) ("It is well settled by the courts that the legislature, in the absence of special authorization in the constitution, is without power to abolish a constitutional office or to change, alter, or modify its constitutional powers and functions.") (*overruled on other grounds by Harvey v. Second Judicial Ct.,* 117 Nev. 754, 32 P.3d 1263 (Nev. 2001)); *State ex rel. Kennedy v. Brunst*, 26 Wis. 412 (1870); *State ex rel. Gaston v. Black*, 74 So. 387 (Ala. 1917)). The court concluded as follows:

> It was long ago determined that the legislature has no power to take from a constitutional officer the substance of the office itself, and transfer it to another who is to be appointed in a different manner and will hold the office by a different tenure from that which is provided for by the constitution. *Warner v. People ex rel. Conner*, 1845, 2 Denio, 272, 43 Am.Dec. 740. A constitutional office cannot be destroyed nor an incumbent legislated out of it in the absence of express constitutional authority, *State ex rel. Gaston v. Black*, 1917, 199 Ala. 321, 74 So. 387, 388, and what may not be done directly cannot be accomplished by indirection.

*Hudson*, 263 P.2d at 369.

[¶23] A similar conclusion was reached by the Idaho Supreme Court in *Wright v. Callahan*, 99 P.2d 961 (1940). In that case, the court addressed a challenge by the elected state auditor to a statute that, according to the auditor, improperly allowed the newly-created office of comptroller to "assume, usurp and perform powers and duties vested in the State Auditor by the Constitution." *Id*. at 962.[5] The Idaho court reviewed a collection of cases from other jurisdictions establishing that constitutional officers possess inherent power, and cited its own precedent consistent with that principle:

> In *State v. Malcom*, 39 Idaho 185, 226 P. 1083, 1084, citing with approval *Love v. Baehr*, [47 Cal. 364 (1874)], and *State ex rel. Josephs v. Douglass*, 33 Nev. 82, 110 P. 177, it is stated:

---

[5]Article 4, Section 1 of the Idaho Constitution established the office of state auditor, in addition to other executive offices, and provided that those offices "shall perform such duties as are prescribed by this [C]onstitution and as may be prescribed by law." *Id.* at 964.

> "When the Constitution devolves a duty upon one officer, the Legislature cannot substitute another."

> And in *Givens v. Carlson*, 29 Idaho 133, 157 P. 1120, 1122, we quoted with approval from Cooley's Constitutional Limitations (8th ed.) p. 61, note 2, as follows:

>> "The Legislature cannot take from a constitutional officer a portion of the *characteristic* duties belonging to the office, and devolve them upon an officer of its own creation."

*Id*. at 965-66 (emphasis in original). The Idaho court ruled that the state auditor was vested with implied powers under the Idaho Constitution, and the legislature's attempt to transfer those powers to the comptroller was contrary to the Constitution. "Furthermore," the court concluded, "to permit the legislature to create an office and vest in the appointee the powers and duties conferred upon a constitutional officer, would be to permit the legislature to nullify the Constitution and reduce it to a mere scrap of paper." *Id*. at 966.

[¶24] Similarly, in *State ex rel. Mattson v. Kiedrowski*, 391 N.W.2d 777, 778 (Minn. 1986), the Minnesota Supreme Court addressed a challenge to a statute "which transferred most of the responsibilities of the State Treasurer, an executive officer, to the Commissioner of Finance, a statutory position." The constitutional provision at issue in that case stated, "The duties and salaries of the executive officers shall be prescribed by law." *Id*. at 780. The court began its analysis by noting that

> The provision in Article V providing that the duties of the state executive offices "shall be prescribed by law" is present in several other state constitutions. Appellate courts in these jurisdictions have consistently held that the prescribed-by-law provision does not allow a state legislature to transfer inherent or core functions of executive officers to appointed officials.

*Id*. The court catalogued several of these decisions, and consistent with this precedent, ruled that the legislature's power to prescribe the duties of an office was subject to constitutional limitations:

> Although the prescribed-by-law provision of Article V affords the legislature the power, in light of public health and welfare concerns, to modify the duties of the state executive officers, it does not authorize legislation, such as Chapter 13,

13

that strips such an office of all its independent core functions. The mandate in Section 1 of Article V, that the executive department consist of a governor, lieutenant governor, secretary of state, auditor, treasurer and attorney general, implicitly places a limitation on the power of the legislature, under Section 4 of Article V, to prescribe the duties of such offices. The limitation is implicit in the specific titles the drafters gave to the individual offices.

This is not to say that the legislature could not name officials to perform some of the core functions of an executive office; core functions of such offices can be shared with statutory officials. The limitation implicit in Section 1 of Article V serves only to prevent the legislature from abolishing all of the independent functions inherent in an executive office. To allow the legislature to abolish all such functions of an executive office is to allow it to do violence to the title the drafters afforded the office and the core functions necessarily implied therefrom.

. . . In granting the legislature the power to prescribe the duties of such executive officers in Article V, the drafters could not have intended to afford the legislature the power to abolish these offices by statute. In Article IX, the drafters enumerated the only procedure by which such offices could be eliminated: the constitutional amendment process. By statutorily abolishing all of the independent core functions of a state executive office, the legislature, in effect, abolishes that office, and the will of the drafters, as expressed in Article IX, is thereby thwarted.

Admittedly, the State Treasurer still has some miscellaneous duties under Chapter 13. He is a member of the State Executive Council and the State Board of Investment. He also is required to keep a separate record of the state bond fund, although this duty may be somewhat difficult to carry out in light of the fact that most, if not all, of the financial information formerly kept by the State Treasurer's Office has been transferred to the Department of Finance. These very minor duties aside, there is little doubt that the Office of State Treasurer now stands as an empty shell. . . .

We must give meaning to Section 1 of Article V, as well as Article IX. . . . To permit the legislature to gut an executive office as it did in Chapter 13 is to hold that our state constitution is devoid of any meaningful limitation on legislative discretion in this area.

*Id*. at 782-83 (footnote omitted). The court concluded the statute was unconstitutional:

It appears that Chapter 13 was precipitated by the actions of the individual occupying the state treasurer position. The individual, however, was duly elected by the people of this state in accordance with Article V of our state constitution. If the individual occupying the office should be removed, the legislature has at its disposal the impeachment process of Article VIII. If the position is no longer warranted for the efficient administration of state government, the legislature can present to the people, in accordance with Article IX, a constitutional amendment eliminating the office. The drafters did not, however, give the legislature the option of statutorily abolishing this state executive office. Such a remedy lies only with the people.

*Id*. at 783. Other similar cases include *Thompson v. Legislative Audit Comm'n*, 448 P.2d 799, 801 (N.M. 1968) ("Of course the legislature cannot abolish a constitutional office nor deprive the office of a single prescribed constitutional duty. Nor can this be done by indirection, such as depriving him of all statutory duties, thereby leaving the office in name only, an empty shell."); and *American Legion Post No. 279 v. Barrett*, 20 N.E.2d 45, 51 (1939) ("The constitution . . . provides that public officers, including the State Treasurer, shall perform such duties as may be required by law. Nothing in the constitution further defines the duties of the State Treasurer [but we have] held that those duties are such as are to be implied from the nature of the office and of them he may not be deprived or relieved.").

[¶25] The State concedes that "some courts" have recognized that there are inherent powers in constitutional executive offices that cannot be abridged by legislation despite the existence of "as prescribed by law" language in the constitutional provision creating the office. The State attempts to limit those cases to constitutional offices that possess "characteristic common law duties, such as an auditor or attorney general." The State contends that the Superintendent is not a "common law official, and there is no basis to infer what duties should be considered." In this case, however, there is no need to ascertain the "characteristic common law duties" of the office of the Superintendent because our constitutional framers expressly entrusted the power of "general supervision

15

of the public schools" to the Superintendent in Article 7, Section 14 of the Wyoming Constitution.

[¶26] The only precedent provided by the State that bears upon this issue is *State ex rel. Langer v. Totten*, 175 N.W. 563 (N.D. 1919). *Langer* involved interpretation of the North Dakota Constitution, which does not contain any provision similar to Article 7, Section 14 of the Wyoming Constitution.[6] To the extent that *Langer* can be viewed as holding that the phrase "as prescribed by law" places unrestricted discretion in the legislature to determine the powers and duties of constitutional offices, it is at odds with the majority of courts that have considered the issue.[7] It is also at odds with prior precedent from the North Dakota Supreme Court recognizing the existence of inherent power in constitutional offices that cannot be legislated away despite the presence of "as prescribed by law" language in the constitutional provision at issue.

[¶27] Prior to *Langer*, the North Dakota Supreme Court had occasion to address the power of the legislature to eliminate or transfer inherent powers from a constitutionally recognized office. In *Ex parte Corliss*, 114 N.W. 962 (N.D. 1907), the court was presented with a constitutional challenge to a legislative act creating an "enforcement commissioner" and granting that position the "power, whenever he deems the exercise thereof necessary, to displace the regularly elected state's attorney and sheriff in any county, so far as the enforcement of the so-called 'Prohibition Law' is concerned in such county." *Id.* at 964. The challenge was predicated upon Article 10, Section 173 of the North Dakota Constitution, which provided in pertinent part: "At the first general election held after the adoption of this constitution, and every two years thereafter, there shall be elected in each organized county in the state, a . . . sheriff and state's attorney. . . . The legislative assembly . . . shall prescribe the duties and compensation of all county, township and district officers." The court rejected the argument that this provision provided the legislature with unrestricted power to prescribe the duties of constitutionally recognized offices. It stated that such an argument, "carried to its logical and inevitable result, would lead to the monstrous doctrine that the constitution means nothing, and,

---

[6] The constitutional provision at issue in *Langer* was similar to Article 4, Section 12 of the Wyoming Constitution. That provision stated:

> The powers and duties of the secretary of state, auditor, treasurer, superintendent of public instruction, commissioner of insurance, commissioners of railroads, attorney general, and commissioner of agriculture and labor, shall be as prescribed by law.

N.D. Const., art. 3, § 83 (1905).

[7] *See supra* ¶¶ 22-24.

16

notwithstanding its plain provisions, the legislative assembly may provide that the duties pertaining to all these offices shall be discharged by officers appointed in some manner prescribed by them." *Corliss*, 114 N.W. at 965. The court held as follows:

> The act in question does not purport to prescribe the duties of these constitutional officers, but it attempts to vest in other persons not elected the power to perform such duties, and to this extent supplant these constitutional officers. Such legislation, in our opinion, cannot be sustained. It strikes a blow at the very foundation principles of our form of government. . . .
>
> If the offices mentioned in section 173, which includes those of state's attorney and sheriff, "are imbedded in the constitution," it inevitably follows that they cannot be stripped by the legislature of the important duties inherently connected therewith, for if this can be done, then these offices were "imbedded in the constitution" for no purpose. We do not deny the power of the legislature to prescribe duties for these officers, which power carries with it by implication the right to change such duties from time to time as the public welfare may demand; but we deny its power to strip such offices, even temporarily, of a portion of their inherent functions and transfer them to officers appointed by central authority. This, as we view it, is a plain violation of the constitution.

*Id.*

[¶28] In *Langer*, North Dakota's superintendent of public instruction asked the court to "compel the board of administration and the educational commission to refrain from preparing and prescribing the courses of study for the common schools of the state," a request that challenged the constitutionality of legislation granting the power of general supervision and administration of the public schools to a new "board of administration." *Id.*, 175 N.W. at 564. The superintendent contended that the statute was unconstitutional because it "deprives a constitutional officer [the superintendent] of a power that is inherent in the office." *Id.* at 566. In asserting that position, the superintendent relied upon the North Dakota Supreme Court's decision in *Corliss*. The *Langer* court rejected the argument and determined that *Corliss* was "not in point" because

> [i]n that case the constitutional question involved the right of the legislature to transfer from the state's attorney to an

17

enforcement commissioner by legislative act duties that inhered in the office. With reference to the state's attorney, the Constitution simply provides for an election of such state's attorney, but makes no provision for further prescribing his duties by statute.

*Langer*, 175 N.W. at 564-65.

[¶29] It is difficult to follow the court's reasoning. In *Corliss*, the court concluded that there were inherent powers and duties in the office of sheriff and the state's attorney that could not be abrogated by legislation. The constitutional provision at issue in *Corliss* provided that the "legislative assembly . . . shall prescribe" those duties. N.D. Const., art. 10, § 173 (1905). To the extent that there is a conflict between the holdings in *Corliss* and *Langer* as to whether the phrase "prescribed by law" permits the legislature to eliminate or transfer inherent duties from a constitutional office, we find the court's reasoning in *Corliss* more persuasive.

[¶30] The issue before us is one of first impression. The State, however, suggests that language from our school finance precedent supports its claim that the legislature has unlimited authority to "prescribe" powers and duties of the Superintendent. In both *Washakie Cnty. Sch. Dist. No. 1 v. Herschler*, 606 P.2d 310, 320 (Wyo. 1980) and *Campbell County Sch. Dist. v. State*, 907 P.2d 1238, 1263 (Wyo. 1995) (*Campbell I*), we stated: "the legislature has complete control of the state's school system in every respect." Although the Court in *Washakie* referenced Article 7, Sections 1 and 14 in making that statement, it seems clear that the primary basis for the Court's statement was Article 7, Section 1.[8] Both cases involved constitutional challenges to Wyoming's system of financing public education. They did not address the issues presented in this case. Moreover, in a subsequent school financing decision, we made it clear that legislative power pertaining to state education was subject to constitutional limitations:

---

[8] Article 7, Section 1 provides:

**§ 1. Legislature to provide for public schools.**

The legislature shall provide for the establishment and maintenance of a complete and uniform system of public instruction, embracing free elementary schools of every needed kind and grade, a university with such technical and professional departments as the public good may require and the means of the state allow, and such other institutions as may be necessary.

18

> While we recognize the legislative and executive branches of Wyoming's state government have broad powers and responsibilities in providing the fundamental right of an education to our children, the powers of each branch of government are bound by the mandates and the constraints of the Wyoming Constitution.

*Campbell II*, 2001 WY 90, ¶ 32, 32 P.3d 325, 332 (Wyo. 2001).

[¶31] There is no question that the legislature has the power to alter the powers and duties of the Superintendent. That authority is specifically granted under the "as prescribed by law" language of Article 7, Section 14. To hold that the legislature does not have that constitutional authority would render the second clause of Article 7, Section 14 meaningless. In this case, however, we must determine whether there are limits to the authority to prescribe.

[¶32] The State contends that the legislature's authority to prescribe is unrestricted.[9] Interpreting "prescribed by law" as the State urges us to do would render Article 7, Section 14 meaningless. If the first clause of Article 7, Section 14 does not limit the authority of the legislature to prescribe the duties of the Superintendent, then Article 7, Section 14 is unnecessary. Another section of the Constitution, Article 4, Section 12, already provides that the powers and duties of the Superintendent, and other executive

---

[9] In its brief, the State makes the following assertions:

> Article 7, [S]ection 14 of the Wyoming Constitution, which creates the office of the Superintendent, expressly delegates power to the Legislature to dictate the powers and duties of the State Superintendent of Public Instruction.

> Through [the second clause of Article 7, Section 14], the drafters delegated power to the Legislature to dictate the powers of the State Superintendent of Public Instruction.

> [T]he lesson of *Mau* is that the phrase "prescribed by law" permits the Legislature to establish or to limit duties at its discretion.

> Superintendent Hill may dislike the consequences of the constitutional language— arguing that "the 'prescribed by law' clause should not become a mechanism for the legislative body to convert general superintendency to its own purposes that it then can freely transfer to another person, body, or agency"—but courts do not change interpretations simply because another interpretation leads to a favored result.

> The Wyoming Constitution explicitly grants to the Legislature the authority to determine the scope of the powers and duties of the Superintendent.

officers, shall be "as prescribed by law." Further, if "prescribed by law" permits the legislature to abolish the Superintendent's power of general supervision, then the first clause of Article 7, Section 14 serves no purpose. We must attempt to give meaning to all words and phrases so that no part "will be inoperative or superfluous." *Geringer*, 10 P.3d at 520. The State's proposed interpretation violates this cardinal rule of constitutional interpretation.

[¶33] The reasoning of those courts rejecting legislative attempts to restrict inherent power in a constitutional office is persuasive. It is even more compelling when applied to an express grant of constitutional authority. If an **implicit** grant of power cannot be extinguished by the legislature, there should be no question that the **express** grant of power to a constitutionally created office cannot be abrogated legislatively. The office of Superintendent is a constitutional office and the entrustment of general supervision is a specific grant of power and responsibility to that office. That power cannot be legislatively removed unless there is specific authorization in the Constitution for such action. There is no such authorization in the Wyoming Constitution.

[¶34] Accordingly, we hold that the phrase "shall be prescribed by law" in Article 7, Section 14 of the Wyoming Constitution does not provide the legislature with unrestricted power to eliminate or transfer powers and duties of the office of Superintendent. The legislative authority to "prescribe" is limited by the first clause of Article 7, Section 14. While the legislature can prescribe powers and duties of the Superintendent, it cannot eliminate or transfer powers and duties to such an extent that the Superintendent no longer maintains the power of "general supervision of the public schools."

[¶35] The constitutional issue in this case, then, as appropriately framed, is whether, under the Act, the Superintendent retains the constitutionally granted power of "general supervision of the public schools" set forth in Article 7, Section 14 of the Wyoming Constitution. To resolve that issue, we must determine the meaning of the phrase "general supervision" as used in Article 7, Section 14. Again, "We look first to the plain and unambiguous language to determine intent. If the language is plain and unambiguous, there is no need for construction, and we presume the framers intended what was plainly expressed." *Cathcart v. Meyer*, 2004 WY 49, ¶ 39, 88 P.3d 1050, 1065 (Wyo. 2004) (internal citations omitted).

[¶36] When determining the meaning of constitutional language, we must attempt to understand the meaning of the language as it was understood at the time our Constitution was ratified. *See Campbell I*, 907 P.2d at 1258; *Witzenburger v. State*, 575 P.2d 1100, 1111-12 (Wyo. 1978). At the time of ratification, the terms "general," "supervision," "superintendent," and "superintend" were defined as follows:

General: Pertaining or applicable to or predicable of all objects of a given class, . . . ; universal within the limits of the class or group of things considered; . . . [c]omprising or pertaining to the whole; collective: opposed to *partial*; . . . [n]ot specifically limited in scope, operation, or function; not restricted to special details, particulars, or occasions: used of authority conferred, or of office or employment exercised.

The Century Dictionary 2482 (1889) (emphasis in original).

Supervision: The act of supervising or overseeing; **oversight**; superintendence; **direction**.

Superintendent: One who superintends, or has the **oversight** and **charge** of something with the **power of direction**.

Superintend: To have **charge** and **direction** of, as of a school; direct the course and **oversee** the details of (some work, of the construction of a building, or movement, as of an army); regulate with authority; **manage**.

=Syn. To overlook, supervise, guide, regulate, control, conduct, **administer**.

The Century Dictionary 6071, 6066 (1891) (emphasis added).[10]

[¶37] We must apply these definitions recognizing that the Superintendent is a constitutional officer in the executive branch of government. The executive branch of

---

[10] The language employed has essentially the same meaning today as it did in 1890. The following are modern definitions of these terms:

General: involving, applicable to or affecting the whole.

Supervision: the action, process, or occupation of supervising; *esp*: a critical watching and directing.

Superintendent: one who has executive oversight and charge.

Superintend: to have or exercise the charge and oversight of: DIRECT.

Merriam-Webster's Collegiate Dictionary 520, 1255, 1254 (11th ed. 2012).

government is the "branch of government charged with administering and carrying out the law." Black's Law Dictionary 651 (9th ed. 2009). When the definitions are applied to the first clause of Article 7, Section 14, it would appear that the framers' intention was that the Superintendent would be the executive officer in "charge" of the state public school system with broad authority to oversee, direct, and administer.

[¶38] In many respects, the State's position is consistent with this interpretation. The State cites a similar dictionary definition of "general" and asserts that "supervision" is the "act of overseeing; inspection; superintendence." According to the State, "general supervision" entails "supervision at a high level over such issues as apply to **all** schools in Wyoming." (Emphasis in original.) In other respects, however, the State's position is at odds with our interpretation. The State claims that the phrase "general supervision" is not "an affirmative grant of power to the Superintendent." According to the State, it is best understood as "a restriction on the Superintendent's authority." The term "general supervision" means "only that the Superintendent's core function is one that enables a broad view of education in Wyoming." The essence of the State's position is captured in this assertion: "General supervision" is "a grant of limited responsibility and only . . . in areas where no specific supervision is to be had." The State contends that its interpretation is bolstered by the constitutional debates and the legislative history pertaining to the office of the Superintendent. We disagree.

[¶39] We undertake our review of the constitutional debates with some trepidation. As a general proposition, reference to the debates for interpretation of constitutional language is appropriate only if we find the provision at issue to be ambiguous. *Rasmussen*, 7 Wyo. at 138, 50 P. at 824. We have not made that determination in this case. Additionally, long ago, we recognized that

> The debates of the convention are not a very reliable source of information upon the subject of the construction of any particular word or provision of the constitution. As we understand the current of authority, and the tendency of the courts, they may for some purpose, but in a limited degree, be consulted in determining the interpretation to be given some doubtful phrase or provision; but, as a rule, they are deemed an unsafe guide.

*Id.* The difficulty in using the statements of individual delegates to determine the meaning of words used in the Constitution "rests in the proposition that to do so we must attribute such intention to the convention itself and to the people adopting the instrument, when it may be true, for all that we can know, that but few may have heard or learned of the remarks referred to." *Id.*, 7 Wyo. at 137, 50 P. at 824. *See also Greenwalt v. Ram Restaurant Corp.*, 2003 WY 77, ¶ 52, 71 P.3d 717, 735 (Wyo. 2003) (rejecting letter

from Legislator as evidence of legislative intent).

[¶40] The problem is exacerbated in this case because there was no debate regarding the adoption of Article 7, Section 14. It passed without objection:

> Mr. Chairman. Sec. [14][11] will be read. Is there any objection to Sec. [14]? The chair hears none.

*Journal and Debates of the Constitutional Convention of the State of Wyoming*, Vol. 2, at 738 (1893). The only significant discussion regarding the Superintendent involved the setting of salaries for executive offices in Article 4, Section 13. As originally proposed, the salaries were not equal. An amendment to increase the salaries of the Treasurer and Superintendent was proposed. Mr. Campbell began the discussion:

> Can anyone see why the auditor, taking into account his duties and qualifications necessary, should receive two thousand dollars, and the superintendent of public instruction receive fifteen hundred dollars? From the information before me at present I should [think] the superintendent should receive two thousand dollars, and cut down the auditor to fifteen, if necessary to keep the figures the same.

Other delegates responded:

> Mr. RINER: . . . Considering the duties of our present superintendent of public instruction I think the salary is sufficient, and it leaves it in the power of the legislature in case the duties of the office should increase, to increase the salary and make it a proper amount.
>
> . . .
>
> Mr. COFFEEN: . . . The superintendent ought to be elected and most carefully selected, and his office should be at the seat of government, at the capital. . . .
>
> Mr. HAY: I would like a little information as to the duties of the superintendent of public instruction. As I understand it, he only gets about five hundred a year now, and it seems to

---

[11] During the constitutional debates, Section 14 was identified as Section 15.

me for what he does he is pretty well paid at that. If he is going to be ex-officio president of the university it might be different, but simply for the superintendent I think two thousand dollars is too much.

Mr. BROWN: . . . If the duties of the superintendent of public instruction are to be the same as they are now, I agree with my friend that five hundred dollars is too much, but if the duties of the superintendent of public instruction are to be as they shall be made by law, two thousand dollars is too small. When a man goes over this territory and performs the duties of his office as they should be performed, and as the law makes him perform them, [it takes] a man . . . most of his time. And he will do well if he puts in all his time and has time for the work. The reason I made this motion is that I think all of these officers should be paid the same salary. Why should the auditor receive more than the treasurer? They should have the same salary, nothing less surely.

*Id.*, Vol. 1, at 463-65. The debate concluded with comments from Mr. Hoyt:

If I may be permitted on this subject, as chairman of the committee on education, and other matters on education, which committee has already sent in its report, I desire to say that according to the plan and purpose of that committee, which I trust will be approved by the convention, they propose that the superintendent of public instruction shall be a member of the board of public lands, he shall have to do with the managements of these lands, that is the large body of lands that will come to the state in the interests of schools and education, he will have to do with the apportionment of the funds to the different counties, he will have a heavy correspondence with all parts of the state. There will no doubt in every county be a county superintendent with whom he will have official relations, it will be his duty to travel all over the state, to visit every county, to attend the institutes as they may hold their meetings, and to oversee the whole work of education in the state. According to the report of the committee he would be a member of the state board of health, to inspect the schools so as to bring the public schools under regulations of health, and promote in a general way education in this state. He will therefore be the head of education in this

> state. And I think should have a salary suitable to the needs of
> the office.

*Id.* at 465. Ultimately, the amendment passed and Article 4, Section 13, as adopted, set equal salaries of $2000 for the four executive officers.

[¶41] Not surprisingly, the parties emphasize different comments from the delegates to support their position. The State contends the debate reflects that the duties of the Superintendent were "extremely modest" at that time. According to the State: "the delegates clearly envisioned an important role for the Superintendent, but the role was to carry out statutory duties the Legislature would later assign to that office. The Superintendent was to 'promote in a general way education in this state.'" (Emphasis omitted.)

[¶42] Appellants draw our attention to the remarks of Mr. Coffeen and Mr. Hoyt. They suggest that Mr. Hoyt's comments as Chairman of the Education Committee are particularly relevant. They emphasize his comment that it will be the duty of the Superintendent "to oversee the whole work of education in the state." They stress the concluding remarks of Mr. Hoyt: he will "promote in a general way education in this state. He will therefore be the head of education in this state."

[¶43] The fact that both parties can find language in the debates to support their position reinforces the cautionary note sounded in *Rasmussen*. We are hesitant to attach much significance to the debates to aid our interpretation of Article 7, Section 14. We agree with the State that the debates reflect that the delegates envisioned an important role for the Superintendent. The delegates placed the Superintendent on equal constitutional footing with the other executive offices of Treasurer, Auditor, and Secretary of State. We also agree that the delegates expected the legislature to increase the duties of the Superintendent commensurate with the growth of the state education system. The debates do not support the State's assertion that the only role of the Superintendent would be to "promote in a general way education in this state." The debates indicate that was to be one of many responsibilities of the Superintendent. The delegates recognized that there were local school officials (county superintendents) but, to the extent that there would be a state educational system, there was no suggestion in the debates that any delegate thought that anyone other than the Superintendent should be at the helm of such a system.

[¶44] The delegates envisioned that the scope of the Superintendent's duties would be statewide and would involve a broad array of concerns. That is consistent with the interpretation of "general" existing at that time. The references to "head of education" and "oversee" are consistent with the definition of "superintendent," "superintend," and "supervision" existing at the time of the debates. In *Rasmussen*, 7 Wyo. at 138-40, 50 P.

at 824-25, the Court interpreted the constitutional provision at issue according to the plain language of the provision, despite compelling discussion during the debates at odds with that interpretation. That is not the situation presented in this case. The debates are consistent with our interpretation of the plain language of Article 7, Section 14.

[¶45] In an effort to support its interpretation of the phrases "general supervision" and "prescribed by law," the State has provided an extensive summary of legislation from territorial times to the present pertaining to the office of Superintendent.[12] Our review of that history reveals legislative treatment of the office of Superintendent that is consistent with our interpretation of the phrase "general supervision." With the exception of one very short-lived legislative enactment, the Superintendent has been the executive officer in charge of the state public school system, with broad authority to oversee, direct, and administer.

[¶46] In 1873, the Territorial Legislative Assembly passed "An Act providing for the Organization of School Districts, Schools and for Other Purposes." 1873 Laws of Wyoming ch. LVIII. The Act specified responsibilities at the local level for the "county superintendent of schools." *Id.* §§ 7-9. It provided for the organization of school districts and specified powers and obligations of local school boards and district officers. *Id.* §§ 10-50. The Act also established the office of superintendent of public instruction and specified powers and duties of the office. *Id.* §§ 2-6. The Act provided that the Superintendent "shall have a general supervision of all the district schools of the Territory and shall see that the school system is, as early as practicable, put into uniform operation." *Id.* § 2. The Act provided rulemaking authority to the Superintendent: "He shall make all further rules and regulations that may be necessary to carry the law into full effect, according to its spirit and intent, which shall have the same force and effect."[13]

---

[12] We have previously indicated that legislative history is properly considered in constitutional interpretation if the language at issue is ambiguous. *Geringer*, 10 P.3d at 521. We have not made that determination in this case, nor does it appear that any of the parties are claiming that Article 7, Section 14 is ambiguous. Nevertheless, in the interests of thoroughness, we will address it.

[13] In the Act, the Superintendent was also assigned additional powers and responsibilities. He was required to make a report to the legislature "exhibiting the condition of public schools, and such other matters relating to the affairs of his office as he may think proper to communicate." *Id.* § 2. He was provided with the "power to grant certificates of qualification to teachers of proper learning and ability to teach in any public school in the Territory, and to regulate the grade of county certificates." *Id.* § 4. He was also required to hold a Territorial teachers institute. One of the duties of the institute was to "decide upon a series of books and a system of education which shall be uniform throughout the Territory." *Id.* § 5. Once that was decided, the Act provided that "it shall be the duty of the Territorial superintendent to see that the books and system decided upon shall be introduced in all the schools of the Territory, to the exclusion of all others." *Id.* The Act authorized school districts to adopt rules of order for the conduct of their meetings to the extent that rules were "not incompatible with . . . the instructions of the

26

*Id.* Under the Act, the Superintendent was cloaked with the attributes of an executive officer. The legislative assembly decreed that there shall be a uniform school system. It was the responsibility of the Superintendent to implement that directive. Our interpretation of the meaning of "general supervision" in Article 7, Section 14 is consistent with the legislative view of the office as it existed at the time of adoption of our Constitution in 1890.

[¶47] Our interpretation is also consistent with legislative treatment of the office after statehood. The Superintendent's duties and responsibilities did not change significantly in the years immediately following adoption of the Constitution. The 1873 legislation remained in effect after adoption of the Constitution pursuant to Article 21, Section 3 of the Wyoming Constitution.[14] That changed in 1917, however, with the enactment of legislation that was, in many respects, very similar to the legislation challenged in this litigation.[15] In the 1917 Act, the legislature transferred nearly all of the powers and duties of the Superintendent to a Commissioner of Education and the Board of Education.

[¶48] The title to the 1917 Act reflects that it was "AN ACT to establish a State Department of Education." 1917 Wyo. Sess. Laws ch. 120. The Act assigned responsibility for the general supervision of the public schools to the State Department of Education, "at the head of which shall be a State Board of Education[16] which shall

---

superintendent of public instruction." *Id.* § 19. The Act also provided that if a "majority of the voters in any school district" were dissatisfied with the formation of any school district, they could appeal from the decision of the county superintendent to the board of county commissioners and from that decision to the superintendent of public instruction. *Id.* § 11.

[14] That provision was entitled: "Territorial laws become state laws." It states: "All laws now in force in the Territory of Wyoming, which are not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the legislature."

[15] In 1915, the legislature created "The School Code Committee," which was directed

> to make a thorough investigation into the needs of the public schools of Wyoming and the laws under which they are organized and operated; to make a comparative study of such other public schools as may seem advisable and to report to the Governor and to both Houses of the Fourteenth Legislature of the State of Wyoming, recommending a Revised Code of School Laws.

1915 Wyo. Sess. Laws ch. 157, § 3. The Committee prepared a final report in 1916. It is likely that this report prompted the 1917 legislative action. The legislature did not adopt all of the Committee's recommendations.

[16] The Board consisted of the Superintendent plus six other members appointed by the Governor. *Id.* § 4.

administer the State system according to law for the best interests of the people and of the State, making such rules and regulations as may be necessary for the proper and effective administration of the same." *Id.* § 1. The legislation created the new office of "Commissioner of Education" and made the Commissioner the "executive head of the public school system of the State." *Id.* §§ 1, 18.

[¶49] The Act prescribed an extensive list of powers and duties to be exercised by the Board and the Commissioner. *Id.* §§ 6-32. It also specified that the Board, "through the Commissioner," was to exercise "general control and supervision over the public schools and the educational interests of the State." *Id.* § 7. The legislation was repealed two years later amid concerns about its constitutionality.

[¶50] The Attorney General, in his 1917-1918 biennial report to the Governor, noted that "the general supervision and control of the public schools has been entrusted to a State Board," and stated that this "provision of law [is] in conflict with the provisions of Section 14, Article 7 of the State Constitution." Douglas A. Preston, *Biennial Report of the Attorney General to the Governor of Wyoming 1917-1918*, at 8 (1919). The Superintendent reported "a slight legal conflict of authority," and recommended "that the state constitution be amended so as to abolish the office of State Superintendent of Public Instruction." Edith K.O. Clark, *Biennial Report of the Superintendent of Public Instruction 1917-1918*, at 6 (1918). The Governor sounded this warning in his address to the 1919 legislature:

> Any proposed legislation for the betterment of our schools should be given careful thought, and I hope that you will not postpone the consideration of such bills until the closing hours of the session.
>
> In devising these laws, I suggest that you make certain that they will conform with the Constitution, as we cannot afford to have any law affecting our entire school system prove to be unconstitutional. We must plan for a school organization which will bring our standard up to that set by other states.

*Journal of the House of Representatives of the Fifteenth State Legislature of Wyoming*, at 17 (1919). In that same legislative session, the legislature restored the supervising power of the office of the Superintendent and repealed the 1917 legislation.[17]

---

[17] *See* 1919 Wyo. Sess. Laws ch. 127 entitled: State Department of Education "AN ACT to amend and re-enact Chapter 120, Session Laws of 1917, relating to a State Department of Education."

[¶51] Duties and powers that had been prescribed for the Board and the Commissioner in 1917 were largely transferred to the Superintendent in the 1919 legislation. 1919 Wyo. Sess. Laws ch. 127. The 1919 legislation provided that:

- "The general supervision of the public schools shall be entrusted to the State Superintendent of Public Instruction, who shall **administer** the State system according to law for the best interests of the people and of the state, **making** such rules and regulations as may be necessary for the proper and effective **administration** of the same." *Id.* § 1.

- "The State Superintendent of Public Instruction shall exercise general **control** and supervision of the public schools and the educational interests of the State." *Id.* § 5.

- The Superintendent "shall **decide** . . . all controversies and disputes involving the administration of the Public school system." *Id.* § 6.

- "He shall have power to **enforce** all provisions of this Act and of the rules and regulations of the State Board of Education." *Id.*

- "The State Superintendent of Public Instruction with the State Board of Education shall **prescribe policies of educational administration throughout the State**, and shall recommend rules and regulations for the administration of the public school system." *Id.* § 13.

- "There may be field agents, who shall assist in the general supervisory, **advisory** and **inspectorial** duties of the State Superintendent of Public Instruction." *Id.* § 18.

- The Superintendent "shall **consult** with and **advise** through the Commissioner of Education, with Boards of Education, County and City Superintendents, Supervisors, Principals, Teachers, and other such school officers and citizens, and seek in every way to

29

develop public sentiment in support of progressive education." *Id.* § 5.

(Emphasis added.) The new legislation retained the statutorily created office of Commissioner and provided the Commissioner with administrative responsibilities. The legislation, however, expressly subordinated the Commissioner to the Superintendent:

> The Commissioner of Education shall, **under the general supervision and direction of the State Superintendent of Public Instruction,** execute the educational policies of the State Board of Education.

*Id*. § 20 (emphasis added).

[¶52] The powers and duties of the Superintendent set forth in the 1919 legislation were in harmony with the plain language of Article 7, Section 14. We previously determined that the phrase "general supervision" includes the power and responsibility to oversee, direct, and administer the statewide education system. The 1919 legislation was consistent with that definition.

[¶53] Subsequent legislative treatment of the office was also consistent with that definition. After 1919, the Superintendent remained the administrative head of the state educational system. In 1959, the Office of Commissioner of Education was abolished. 1959 Wyo. Sess. Laws ch. 109, § 10. In 1969, the legislature enacted the Wyoming Education Code of 1969. 1969 Wyo. Sess. Laws ch. 111, § 1. Under the Code, the Superintendent remained the administrative head of the state education system. According to the legislation: "The general supervision of the public schools shall be entrusted to the state superintendent who shall be the administrative head and chief executive officer of the department of education." *Id.* § 9.

[¶54] The duties of the Superintendent identified in the 1969 Code are similar to those set forth in the 1919 legislation. Under the 1969 Code, the Superintendent was required to:

- Make rules and regulations consistent with the code as necessary and desirable for proper and effective administration of the state educational system, except in areas specifically entrusted to the state board;

- Consult with and advise the state board and local school boards, administrators, teachers and interested citizens, and seek to develop public support for a

30

> complete and uniform system of education in
> Wyoming;
>
> • Enforce the code and rules and regulations.

*Id.* § 10. The Superintendent retained those powers and responsibilities until the 2013 legislation was enacted.

[¶55] If legislative history is a relevant consideration in constitutional interpretation, it reflects legislative action consistent with our interpretation of the plain language of Article 7, Section 14 and does not support the interpretation offered by the State. Except for the short-lived 1917 Act, the Superintendent's role has never been viewed as merely a "grant of limited responsibility." The responsibilities of the Superintendent have never been limited to promoting "in a general way education in this state." The Superintendent has always had a broad range of responsibilities and has always been the executive officer in charge of administering the state education system.

[¶56] The State's discussion of legislative history appears to flow from its proposed interpretation of the "prescribed by law" language in Article 7, Section 14. The State contends that phrase provides the legislature with unlimited authority to assign or take away powers and duties from the Superintendent. Accordingly, the State offers legislation appointing the Superintendent as the "administrative head" of the Department of Education as evidence of the legislature's power to "prescribe" powers and duties. The State reasons that, if the legislature has the power to make the Superintendent the "administrative head," it also has the authority to remove those powers. In enacting SEA 0001, the State contends the legislature was merely acting as it has for over 100 years.

[¶57] The State does not attempt to draw a distinction between legislation assigning powers and duties to the Superintendent, and legislation removing powers and duties. But there is a difference. The distinction rests in the source of the authority. The Superintendent's power and responsibility of "general supervision" is constitutional in origin. Statutes consistent with that authority merely give effect to the Constitution. *White*, 689 P.2d at 106-07. If the Superintendent's authority were only statutory, the legislature would have authority to eliminate all powers and duties it has assigned to the Superintendent. However, legislation providing that the Superintendent "shall administer the state system" and designating the Superintendent as the "administrative head and chief executive officer of the department of education" does not arise from the legislative power to "prescribe." Rather, it implements the constitutional grant of authority entrusted to the Superintendent in Article 7, Section 14.

[¶58] We turn, then, to the provisions of the 2013 Act to determine whether the Superintendent retains the constitutional power and responsibility of "general supervision

31

of the public schools." The State contends that "the current statute preserves sufficient power so as to satisfy the Constitution." In support of that position, the State quotes language from the 2013 Act providing: "The general supervision of the public schools shall be entrusted to the state superintendent as prescribed by law." 2013 Wyo. Sess. Laws ch. 1, § 2. The State correctly points out that this statutory language parallels the first clause of Article 7, Section 14. In light of that statutory language, the State asserts that Appellants must "meet the burden of a facial challenge to show that the Legislature's grant of 'general supervision' in the . . . Act is illusory." We conclude that Appellants have satisfied that burden. The reservation of the power of "general supervision" in the 2013 Act is illusory.

[¶59] Under the Act, the Superintendent no longer has any supervisory role in the State Department of Education. Wyo. Stat. Ann. § 21-2-104 (LexisNexis 2013). The Act makes the Director "the administrative head and chief executive officer of the state department of education." Wyo. Stat. Ann. § 21-1-104(b). The Act provides that the State Department of Education "shall be under the supervision of the director" and that "[a]ll duties of the state department of education shall be under the control of the director." Wyo. Stat. Ann. § 21-2-104. In the Act, "director" is substituted for "superintendent" in nearly every statutory provision in which the word "superintendent" previously appeared. We will not detail every section in which that substitution was made. We offer three sections from the enrolled Act to illustrate.

[¶60] In the enrolled Act, Wyo. Stat. Ann. § 21-2-201 states:

> (a) The general supervision of the public schools shall be entrusted to the state superintendent ~~who shall be the administrative head and chief executive officer of the department of education~~ *as prescribed by law.*

Wyo. Stat. Ann. § 21-2-104 provides:

> There shall be a separate and distinct state department designated as the state department of education which shall be under the supervision of the ~~state superintendent~~ *director* and consist of the ~~state superintendent~~ *director* and such divisions, staffed by personnel and provided with facilities the ~~state superintendent~~ *director* determines necessary to assist him in the proper and efficient discharge of his respective duties *as approved by the governor. The director shall serve as the chief administrative officer of the department. All duties of the state department of education shall be under the control of the director.*

32

Wyo. Stat. Ann. § 21-2-202 states:

> (a) In addition to any other duties assigned by law, the ~~state superintendent~~ *director* shall:
>
> (i) Make rules and regulations, consistent with this code, as may be necessary or desirable for the proper and effective administration of the state educational system.

This provision proceeds to list duties in 30 other subsections. In those subsections, the word "director" is substituted every time for "superintendent." Wyo. Stat. Ann. § 21-2-202(a)(i-xxx) (LexisNexis 2013).

[¶61]  The State contends that the Superintendent has been left with meaningful duties and responsibilities. The State notes that the Superintendent continues to serve on the State's Board of Land Commissioners, Loan and Investment Board, the Board of Trustees of the University of Wyoming and the State School Facilities Commission. Also, under the 2013 Act, the Superintendent must report to the legislature by October 15 of each year on the general status of the public schools, Wyo. Stat. Ann. § 21-2-201(b), and must identify professional development needs of teachers and provide a plan and up to 5 training sessions to meet those needs. Wyo. Stat. Ann. § 21-2-201(c)(vi). The State points out that the Superintendent is left with authority to adopt rules "as may be necessary for the proper and effective general supervision of the public schools," but it also concedes that the Superintendent's rulemaking authority is limited. The Superintendent's rulemaking authority does not extend to any area where the legislature has given responsibility over that area of law to the State Board of Education or the new Director of the Wyoming Department of Education. Wyo. Stat. Ann. § 21-2-201(a), (c)(i).

[¶62]  According to the State, "the Superintendent now exercises authority unknown at the time of Statehood. The Superintendent has authority over the State's Teacher of the Year Program, rules for the seclusion or restraint of students, efforts to minimize head injuries from school athletics, and the use of toxic chemicals in schools." Wyo. Stat. Ann. § 21-2-201(c)(ii)-(v). As important as those responsibilities may be, they are limited and piecemeal, and even collectively they do not satisfy the "general supervision" mandate of Article 7, Section 14.

[¶63]  The 2013 Act relegates the Superintendent to the role of general observer with limited and discrete powers and duties. Additionally, under the State's proposed interpretation of its authority to "prescribe by law" the legislature could remove all of those powers and responsibilities from the Superintendent in future legislation. This

could not have been the intent of the framers of the Constitution and the people who ratified it.

[¶64]  We should pause at this point to clarify that our function is merely to determine whether the proposed legislation is constitutional.  We are not making any judgment with respect to the merits of the legislation.  We note that, on at least one occasion in relatively recent times, a legislatively created Commission recommended that the constitutional office of Superintendent be eliminated and replaced by a "cabinet level" director who would report "directly to the Governor."  Joint Legislative-Executive Efficiency Study, 1989, at 138 (commonly referred to as the Ferrari Report).  Interestingly, the report touched on some of the issues in this case.  The conclusions of the report are at odds with the State's interpretation of Article 7, Section 14.  The report recognized that the Superintendent of Public Instruction was the "chief state school officer."  *Id.* ("Wyoming is one of 15 states in which the Constitution calls for an elected chief state school officer.").  The report also recognized that a constitutional amendment would be necessary to effectuate the recommended changes:

> The Committee recommends constitutional amendments be submitted to a vote of the people whereby the State Superintendent of Public Instruction is no longer elected. Instead, legislation would provide for appointment by the Governor with Senate approval.  Legislative action of this nature enacted by the 1989 Legislative Session would enable the question to be put before the voters in the general election in 1990.  The current [i]ncumbent's term of office would be completed by the end of calendar year 1990 and this component of the restructuring could be implemented at that time.

*Id.* at 139.

[¶65]  During the 2012 session, legislation was proposed for a constitutional amendment along the lines recommended by the Commission.  It sought elimination of the constitutional office of Superintendent of Public Instruction and replacement by a cabinet officer appointed by the Governor.  The legislation, identified as House Joint Resolution No. HJ0011, provided in part:

> A JOINT RESOLUTION proposing to amend the Wyoming Constitution relating to the superintendent of public instruction; eliminating the elected status of the state superintendent on and after January 5, 2015; providing for

supervision of public schools by the governor through appointed cabinet officer.

The proposed resolution failed introduction. In the 2013 session, the legislature enacted the legislation which is the subject of this litigation.

[¶66] We recognize that the 2013 Act does not "eliminate" the office of Superintendent. It has, however, effectively marginalized the office and has left it "an empty shell." Under any good faith and common sense reading of the 2013 Act, it is clear that the Superintendent no longer has the power and responsibility of "general supervision of the public schools" that is entrusted to an elected Superintendent by Article 7, Section 14. That power has been transferred to the appointed Director of the Department of Education. The legislature has attempted to accomplish through legislation what it may do only through the constitutional amendment process of Article 20, Section 1.[18] Consequently, we conclude beyond all reasonable doubt that SEA 0001 is unconstitutional.

[¶67] Before closing, a few brief comments regarding the dissent are warranted. The dissent concedes that the legislature does not have unlimited authority to prescribe the powers and duties of the Superintendent. Such power is constrained by the general supervision clause of Article 7, Section 14.[19] The dissent also agrees that the fundamental question that must be resolved is whether the Superintendent retains the

---

[18] Article 20, Section 1 provides:

> Any amendment or amendments to this constitution may be proposed in either branch of the legislature, and, if the same shall be agreed to by two-thirds of all the members of each of the two houses, voting separately, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and it shall be the duty of the legislature to submit such amendment or amendments to the electors of the state at the next general election, and cause the same to be published without delay for at least twelve (12) consecutive weeks, prior to said election, in at least one newspaper of general circulation, published in each county, and if a majority of the electors shall ratify the same, such amendment or amendments shall become a part of this constitution.

[19] According to the dissent, "As long as the superintendent retains general supervision of the public schools, which is the case under SEA 0001, the legislature's delegation of duties involving education must be upheld as a proper exercise of its plenary power."

power of general supervision under SEA 0001.[20]  We have concluded that the Superintendent does not retain that power under the Act.

[¶68]  The dissent reaches the opposite conclusion in part because it maintains that the legislature retains the authority to "define . . . what constitutes the function of 'general supervision of the public schools.'"[21]  In making this assertion, the dissent does not specify whether the legislative power to "define" is limited.  If the dissent is contending that the legislative authority to "define" is unlimited, its assertion would appear to conflict with its recognition of the restrictions on the legislative power to "prescribe."[22] If the dissent is contending that the legislative authority to "define" is restricted by the first clause of Article 7, Section 14, this case turns on the definition of general supervision intended by the framers, as reflected in the plain language of the Constitution.  The dissent, largely relying on its interpretation of legislative history, offers the same limited definition of "general supervision" as the State.  We disagree with that interpretation.

[¶69]  If the dissent views the legislative power to "define" as unrestricted, it renders the first clause of Article 7, Section 14 meaningless.  Followed to its logical conclusion, such an interpretation would permit the legislature to eliminate all, or nearly all, of the duties of the Superintendent.  Taken to the extreme, if the dissent is correct, legislation providing that the sole duty of the Superintendent is to administer "the teacher of the year program" would pass constitutional muster.  That could not have been the intent of the framers and the people who ratified our Constitution.

[¶70]  The dissent wonders "If the legislature transferred half of the duties back to [the] superintendent, would that withstand constitutional challenge?"  If that issue is ever presented to this Court, it will be addressed and determined.  The certified questions addressed to this Court involved the constitutionality of SEA 0001, not the constitutionality of any other legislation or potential legislation.  SEA 0001 did not eliminate any duties that the legislature had previously determined were necessary for the "general supervision of the public schools."  It simply transferred nearly all of those duties to the Director.  Article 7, Section 14 mandates that those duties "shall be entrusted to the state superintendent."

---

[20] *See* dissent, ¶ 111.

[21] The dissent reaches this conclusion based in part upon its application of "rules relating to self–executing or non-self-executing" constitutional provisions.  Neither party raised this issue.  If those rules applied, they would not lead to the conclusion reached by the dissent.

[22] According to the dissent, "the legislature clearly is authorized to define, and throughout the State's history has defined, what constitutes the function of 'general supervision of the public schools.'"

36

[¶71] The dissent suggests our opinion leads inexorably to the conclusion that any delegation of authority in the education arena to any entity other than the Superintendent is unconstitutional. In making that assertion, the dissent, like the State, overstates the Appellants' position and our determination. Appellants are not claiming, and we are not holding, that Article 7, Section 14 entitles the Superintendant "to be in charge or control of all aspects of education." Appellants are not claiming, and we are not holding, that the legislature may not delegate duties and powers to other entities such as the board of education and the school facilities commission. We are simply holding that the legislature may not delegate powers and duties to other entities to such an extent that the power of general supervision no longer resides with the Superintendent. In making that determination, we are applying the clear and unambiguous language of Article 7, Section 14.

[¶72] We recognize that this is a matter of "very grave importance" and have approached the question with great caution. We have undertaken our review with the presumption that the challenged statute is constitutional. We have viewed the dissent with an open mind but, ultimately, have not been persuaded. When the legislation is viewed objectively in light of the plain language of Article 7, Section 14, we do not understand how the dissent can reach the conclusion that SEA 0001 is constitutional.

[¶73] The Wyoming Constitution is a fundamental law "established by and expressing the will of the people." *Campbell II*, ¶ 31, 32 P.3d at 332. It is this Court's responsibility to "preserve, protect, and defend the people's fundamental law." *Id.* In the exercise of that responsibility, "we cannot declare valid any legislation which contravenes that fundamental law." *Id.* The result we reach today maintains the integrity of the Wyoming Constitution.

## CONCLUSION

[¶74] The first certified question from the district court states: "Does Senate Enrolled Act 0001 violate Wyoming Constitution Article 7, Section 14?" We answer that question as follows:

1.      Yes. The "prescribed by law" provision in Article 7, Section 14 does not provide the legislature with unlimited authority to prescribe the powers and duties of the office of Superintendent. The legislative authority to prescribe is limited by the responsibility of "general supervision of the public schools" that was entrusted to the Superintendent in Article 7, Section 14. The legislature can prescribe powers and duties of the Superintendent, but it cannot eliminate or transfer powers and duties to such an extent that the Superintendent no longer maintains the power of "general supervision of the public schools." The 2013 Act impermissibly transfers the power of general

37

supervision from the elected constitutional office of Superintendent to the statutory office of Director of the Department of Education who is appointed by the Governor.  Under the Act, the Superintendent no longer maintains the power of general supervision of the public schools.  SEA 0001 is unconstitutional.

[¶75]  In light of our response to the first certified question, it is unnecessary to consider Appellants' challenges to the Act on the constitutional grounds identified in the remaining certified questions.  We remand to the district court for entry of an order consistent with this opinion.

**DAVIS**, Justice, concurring generally and with special concurrence, in which **VOIGT**, Justice, joins.

[¶76]  I write separately only to emphasize certain points.  I am in complete agreement with the reasoning and conclusions of Justice Burke's opinion.

[¶77]  The well-crafted dissent intimates that the majority opinion intrudes upon powers entrusted to the legislature.  I respectfully disagree.  Our system of government is a delicate and uneasy balance between the legislative, executive, and judicial branches.  This balance was conceived to prevent any one branch from becoming tyrannical.  *See* The Federalist No. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.").  The judicial branch was intended by the Founders of the federal government to be the least dangerous, as it had then and has now "no influence over either the sword or the purse" and therefore "neither force nor will, but merely judgment."  The Federalist No. 78 (Alexander Hamilton).  The Wyoming judiciary is subject to the same limitations.

[¶78]  The Wyoming and Federal Constitutions are intended to allocate power between the branches of government, the states (in the case of the Federal Constitution), and the people.  The Wyoming Constitution can be amended by a vote of the people, although a two-thirds vote of both houses of the legislature is required to submit an amendment to the electorate.  Wyo. Const. Art. 20, § 1.  It can also be amended by a constitutional convention if two-thirds of both houses agree to ask the voters whether such a convention should take place, if a majority of the voters agree, and if a majority of voters agree with changes proposed by the convention.  Wyo. Const. Art. 20, § 3.  It is obvious that the delegates to the 1889 constitutional convention intended to craft a system which could only be modified by consent of a super-majority of both houses of the legislature and the consent of the people.  The amendment process was intended to be and is quite difficult.  As James Madison observed of the Federal Constitution in The Federalist No. 43, the Constitution "guards equally against the extreme facility, which would render the constitution too mutable; and that extreme difficulty, which might perpetuate its discovered faults."  The Federalist No. 43 (James Madison).  The delegates and the voters who ratified the Wyoming Constitution likewise deemed changes to Wyoming's organic law to be so important that they could be made only with the consent of the people, and not solely by a majority of their elected representatives in the legislature.

[¶79] Since the decision in *Marbury v. Madison*, courts have been charged with determining whether legislation or executive action complies with constitutions.  5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  Indeed, roughly two hundred years later, we succinctly reiterated that "it is the duty of courts of justice to declare void all

legislative acts contrary to the manifest tenor of the constitution." *State v. Campbell Cnty. Sch. Dist.*, 2001 WY 90, ¶ 30, 32 P.3d 325, 331 (Wyo. 2001) (citing The Federalist No. 78 (Alexander Hamilton)). This is always a controversial duty, and often an unpleasant one, but it is the judicial branch which must make those difficult determinations.

[¶80] There can be no doubt that it is unhealthy for the balance of power between the branches when courts intrude on the powers delegated to the legislature by the people through the Wyoming Constitution. However, it would be equally unhealthy if the judicial branch did not fulfill its duty to determine the meaning of the supreme law of the state as that meaning is expressed in the words of the document. Failure to fulfill that duty could result in the legislative or executive branches exceeding the powers enumerated in the Wyoming Constitution. *Campbell Cnty. Sch. Dist.*, 2001 WY 90, ¶ 32, 32 P.3d at 332 ("While we recognize the legislative and executive branches of Wyoming's state government have broad powers and responsibilities in providing the fundamental right of an education to our children, the powers of each branch of government are bound by the mandates and the constraints of the Wyoming Constitution.").

[¶81] As the majority opinion points out, state constitutions are generally much more specific and detailed than the United States Constitution, and this is certainly true of the Wyoming Constitution. This arguably makes interpretation an easier task, for state courts have more direction in the text than is available to courts interpreting the Federal Constitution. The majority has relied upon the plain language of the Wyoming Constitution to determine that there are constitutionally protected functions of the office of Superintendent of Public Instruction which may not be transferred to another constitutional officer or legislatively created post without amending the Constitution.

[¶82] The dissent relies upon rules of construction to empty the vessel the constitutional convention intended to fill with the easily-understandable words "general supervision," opining instead that the 2013 legislature could by majority vote fill that vessel with meaning of its own. This would allow a transfer of power to a legislatively created director of the state department of education appointed by another constitutional officer, the Governor. I will not reiterate the majority opinion's reasoning, with which I wholeheartedly agree, but I must state my disagreement with the approach of the dissent. We should decide constitutional issues based on the words used in the Wyoming Constitution, not in spite of them.

[¶83] The dissent also contends that the majority's determination that SEA 0001 violated Article 7, § 14 is faulty because our decision does not also specify exactly what duties constitute "general supervision" or delineate the permissible interplay between the Wyoming State Board of Education, the School Facilities Commission, and the

Superintendent. I respectfully disagree.

[¶84] We do not now and never have provided advisory opinions. *See State Board of Equalization v. Jackson Hole Ski Corp.*, 745 P.2d 58, 59 (Wyo. 1987) ("Although the question as postulated in this case may be properly before us in the future, to render an opinion here would be to issue an advisory opinion. This Court has said repeatedly that it will not issue advisory opinions."). The legislature has not enacted any additional education-related legislation which would allow us to address these issues. The parties have asked us, by certified question, to determine whether SEA 0001 as a whole violates Article 7, § 14. We have answered that question.

[¶85] Among the duties swept up in the tide of the large-scale transfer made by the legislation may be some which could in fact properly be transferred to another agency or entity, but that question was not presented to us. If the legislature wishes to enact a more narrowly crafted act based on this ruling, it certainly can and by all means should. If there remains controversy regarding the allocation of specific duties, that legislation could then be reviewed by the courts. I am unaware of any authority which would suggest that courts should in effect draft constitutionally permissible legislation so that the legislature may adopt it. It is ironic that the dissent suggests that the Court should accept the legislature's interpretation of the Wyoming Constitution to avoid invading the province of the legislature, while at the same time suggesting that an unprecedented incursion into the legislative realm is necessary to determine whether SEA 0001 is constitutional or not.

[¶86] It is important to recognize what this case is not about. As the majority opinion says, it is not about whether the system designed by the legislature is better than that designed by the delegates to the constitutional convention – it may well be. It is clear that the constitutional convention delegates' decision to fragment executive power has led to controversy and dissatisfaction with the elected office of Superintendent of Public Instruction almost from statehood, as both the majority and dissent point out. The involvement of the federal government has since made education a much more complex process than it was in 1889. No one could question that the legislature's goal to provide a better system of education with greater accountability is both noble and essential to the well-being of our children and of Wyoming. However, it is not the province of this Court to determine which system would be better, but instead to determine whether SEA 0001 is constitutional in light of Article 7, § 14 and the related provisions of our Constitution.

[¶87] This case is likewise not about the current Superintendent of Public Instruction's performance of her duties. The Wyoming Constitution is not intended to change based upon satisfaction or dissatisfaction with the performance of individual office holders; rather, it is rightfully intended to endure until amended by a vote of the people.

[¶88] Finally, this case is not about whether the office of Superintendent of Public Instruction can be changed or eliminated altogether if the current structure is dysfunctional. It most certainly can be, but that change must come through the amendment process, with the consent of the people. By the words they used in the Wyoming Constitution, we know that the delegates to the constitutional convention and the voters who adopted the Constitution had faith in the people of Wyoming to decide important issues about the structure of their government. We should not deprive the citizens of that power by failing to honor the words the delegates used and the electorate adopted.

**KITE, Chief Justice, and GOLDEN, Justice (Ret.), dissenting.**

[¶89]   Superintendent Hill and the Powers assert that Senate Enrolled Act 0001 (SEA 0001) is unconstitutional because it takes away from the office of superintendent of public instruction (hereinafter superintendent) the powers and duties of general supervision of the public schools. "It is always a matter of very grave importance to decide upon the constitutionality of an act of the Legislature." *State ex rel. Hynds v. Cahill*, 12 Wyo. 225, 281, 75 P. 433, 442 (1904).   In considering a constitutional challenge to a statute, a rule "of controlling importance" is that the "question is to be approached by the judiciary with great caution, and examined in every possible aspect, and a statute should not be declared void unless its invalidity is beyond reasonable doubt." *State ex rel. Sullivan v. Schnitger*, 16 Wyo. 479, 526, 95 P. 698, 709 (1908), Potter C.J. concurring, citing Cooley's Constitutional Limitations (3d ed.) 182.

[¶90]   In concluding that SEA 0001 is unconstitutional, the majority opinion does not adhere to the controlling rule—it does not proceed with the requisite caution, it fails to examine the question from every perspective and it declares the Act unconstitutional although the challengers have not met their burden of establishing it is so beyond a reasonable doubt.   The majority also ignores well established standards governing the interpretation of state constitutions, more than one hundred years of state and territorial history and this Court's repeated statements over many decades to the effect that the legislature is responsible for education in the State "in every respect." *Washakie County Sch. Dist. v. State*, 606 P.2d 310, 320 (Wyo. 1980).

[¶91]   In reaching the conclusion it does, the majority crosses over the line between the appropriate exercise of judicial review and interference in matters within the province of the legislature.   Where, as here, the legislature has enacted laws to carry out its constitutional authority to make means and agencies available to advance opportunities for education in the state, establish and maintain a complete system of public instruction and systems of public schools and prescribe the superintendent's general supervisory powers and duties, it is not this Court's prerogative to intrude.   By doing so, the majority unravels nearly 125 years of historical treatment of education in Wyoming and undermines the very foundation of education in the state.

[¶92] Contrary to the majority's holding, SEA 0001 is a proper exercise of the constitutional charge given to the legislature to provide for education in the State, which expressly includes prescribing the superintendent's powers and duties to generally supervise the public schools.   The Act is consistent with the plain language of the constitution, the manner in which the legislature has responded historically to the constitutional mandate, and this Court's interpretation of the constitution as placing responsibility for education in every respect with the legislature.   The framers of the constitution expressly authorized the legislature to designate what powers and duties fall

43

within "general supervision of the public schools."  The legislature has properly done so in SEA 0001 as it has done throughout the State's history. When the standards for reviewing constitutional provisions are correctly applied, this Court is left with no alternative but to uphold the Act.

## STANDARDS OF REVIEW

[¶93]  Whether a statute is constitutional is a question of law which we review *de novo*. *Baessler v. Freier*, 2011 WY 125, ¶ 13, 258 P.3d 720, 725 (Wyo. 2011).  Since statehood, this Court has consistently followed the maxim that every statute is presumed constitutional and not to be held in conflict with the constitution unless such conclusion is clear, palpable, unavoidable, and beyond reasonable doubt.  *Dir. of the Office of State Lands & Invs. v. Merbanco, Inc.*, 2003 WY 73, ¶ 32, 70 P.3d 241, 252 (Wyo. 2003), citing *Painter v. Abels*, 998 P.2d 931 (Wyo. 2000); *Wyoming Coalition v. Wyoming Game & Fish Comm'n*, 875 P.2d 729 (Wyo. 1994); *Thomson v. Wyoming In-Stream Flow Comm.*, 651 P.2d 778 (Wyo. 1982); *Uhls v. State ex rel. City of Cheyenne*, 429 P.2d 74 (Wyo. 1967); *Taxpayers' League of Carbon County v. McPherson*, 49 Wyo. 251, 54 P.2d 897 (1936); *State v. Sureties of Krohne*, 4 Wyo. 347, 34 P. 3 (1893).  This Court also has consistently adhered to the principle that a person challenging the constitutionality of a statute bears a heavy burden of proving such beyond any reasonable doubt, and we are duty bound to uphold statutes where possible and resolve all doubts in favor of constitutionality.  *Merbanco*, ¶ 32, 70 P.3d at 252, citing *Board of County Comm'rs v. Geringer*, 941 P.2d 742 (Wyo. 1997); *V-1 Oil Co. v. State*, 934 P.2d 740 (Wyo. 1997); *NJC v. State*, 913 P.2d 435 (Wyo. 1996); *Campbell v. State*, 999 P.2d 649 (Wyo. 2000); *Frantz v. Campbell County Memorial Hospital*, 932 P.2d 750 (Wyo. 1997). We have said that a facial challenge such as the one here is "the most difficult . . . to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *Merbanco*, ¶ 32, 70 P.3d at 252, quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987).

## RULES OF CONSTITUTIONAL INTERPRETATION

### *1. General Rules*

[¶94]  In considering constitutional provisions, we apply the same rules we use when interpreting statutes.  *Merbanco*, ¶ 33, 70 P.3d at 252.

> [Our] paramount consideration is to determine the [framers'] intent, which must be ascertained initially and primarily from the words used in the [constitution].  We look first to the plain and ordinary meaning of the words to determine if the [provision] is ambiguous.  A [provision] is clear and

44

> unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a [provision] is ambiguous if it is found to be vague or uncertain and subject to varying interpretations.

*Barlow Ranch, L.P. v. Greencore Pipeline Co.*, 2013 WY 34, ¶ 18, 301 P.3d 75, 83 (Wyo. 2013). Divergent opinions among parties as to the meaning of a provision may be evidence of ambiguity but is not conclusive. *Office of State Lands and Invs. v. Mule Shoe Ranch, Inc.*, 2011 WY 68, ¶ 13, 252 P.3d 951, 955 (Wyo. 2011). In ascertaining the meaning of a provision, we consider all provisions relating to the same subject *in pari materia*. *Id*. When the language is clear, we give effect to the ordinary and obvious meaning of the words used by the framers. *Barlow*, ¶ 18, 301 P.3d at 84.

[¶95] In considering constitutional provisions, we also apply the rules relating to self-executing or non-self-executing provisions. *State ex rel. Vidal v. Lamoureux*, 3 Wyo. 731, 30 P. 243, 244-245 (1892); *Gould Land & Cattle Co. v. Rocky Mt. Bell Tel. Co.*, 17 Wyo. 507, 101 P. 939, 940 (1909); *Hjorth Royalty Co. v. Trustees of University of Wyoming*, 30 Wyo. 309, 222 P. 9 (1924); *Worthington v. State*, 598 P.2d 796, 800-04 (Wyo. 1979); *White v. State*, 784 P.2d 1313, 1317 (Wyo. 1989). If a constitutional provision is not self-executing, further legislation is required and the legislature may act to implement and qualify the provision. The basic guide in determining whether a constitutional provision is self-executing is whether it states a sufficient rule by means of which the purpose it is intended to accomplish may be determined without the aid of legislative enactment. *See generally* Thomas M. Cooley's Constitutional Limitations (8th ed.) 165-170; 16 Am. Jur. 2d *Constitutional Law*, § 104. If a constitutional provision is not self-executing, further legislation is required and the legislature may act to implement and qualify the provision. *Id*.

[¶96] A constitutional provision that "merely indicates principles, without laying down rules by means of which those principles may be given the force of law" is not self-executing. Cooley at 167-168; 16 Am. Jur. 2d *Constitutional Law*, § 104. A provision is not self-executing if, while it is intended to impose duties, it lacks in and of itself sufficient rules by which the duties may be enforced. Cooley at 165; 16 Am. Jur. 2d *Constitutional Law*, § 104. If a constitutional provision is so indeterminate as not to admit of an understanding of its intended scope, it cannot be self-executing, and will not be construed as self-executing when to do so would work confusion. 16 Am. Jur. 2d *Constitutional Law*, § 104. "The question in every case is whether the language of a constitutional provision is addressed to the courts or the legislature, -- does it indicate that it was intended as a present enactment, complete in itself as definitive legislation, or does it contemplate subsequent legislation to carry it into effect?" *Willis v. St. Paul Sanitation Co.*, 48 Minn. 140, 50 N.W. 1110, 1111 (1892). *See also Timm v. Schoenwald*, 400

N.W.2d 260, 264-66 (N.D. 1987) and cases cited therein. A recent decision of the Montana Supreme Court succinctly explained the non-self-executing principle in an action challenging the constitutionality of that state's constitutionally-mandated public school system, not unlike our own *Washakie* and *Campbell* school finance litigation. In *Columbia Falls Elem. School Dist. No. 6 v. State of Montana,* 109 P.3d 257 (Mont. 2005), the court held the state's constitutional provision that the legislature shall provide a basic system of free quality public schools was a non-self-executing provision. *Id.* at 309. The court found that the constitutional provision was addressed to the legislature, not the court, and, therefore, the legislature can best construct a "quality" system of education if it first defines what constitutes a "quality" system of education. *Id.* at 310. As to defining a "quality" system, the court deferred to the legislature. *Id.* Until the legislature provides a threshold definition of "quality," the court stated it could not determine whether the system was adequately funded as the constitution requires. *Id.* at 312.

[¶97] When a constitutional provision contemplates subsequent legislation to carry it into effect, it is non-self-executing. In that event,, "the entire scheme of the constitution" for the particular subject "is for the future -- from the time of the adoption of the constitution -- and requires legislation to put it in force." *Lamoureux*, 30 P. at 244-245. Non-self-executing provisions refer to and authorize future legislation and, until such legislation is had, they are without effect. *Id*. at 245. *See also* Jennifer Friesen, State Constitutional Law (4th ed.) 7-13, noting that non-self-executing provisions may be unenforceable in court prior to legislative action. Statutes enacted supplementary to and in connection with non-self-executing constitutional provisions define the duty referenced in the constitution and "set forth how the duty is to be performed." *Gould Land & Cattle Co.,* 101 P. at 940. Such statutes are to be construed whenever possible so as to give them effect consistent with the constitution. *Burton v. Union Pacific Coal Co.,* 18 Wyo. 362, 107 P. 391, 396 (1910). Additionally, when interpreting statutes enacted pursuant to non-self-executing constitutional provisions, courts generally defer to the legislature. Williams, The Law of American State Constitutions, 344 (2009).

## 2. *Rules Unique to State Constitutions*

[¶98] An important factor distinguishing state constitutions from the federal Constitution is that they are documents of limitation rather than documents granting powers. Williams at 27. We have said of our own state constitution that it is not a grant but a limitation upon legislative power, **meaning the legislature may enact any law not expressly or inferentially prohibited by the constitution**. *Cathcart v. Meyer*, 2004 WY 49, ¶ 45, 88 P.3d 1050, 1067 (Wyo. 2004), citing *Witzenburger v. State ex rel. Wyoming Community Development Authority*, 575 P.2d 1100, 1129 (Wyo. 1978) and *State v. Snyder*, 31 Wyo. 333, 225 P. 1102, 1105 (1924). In other words, we do not look to our constitution to determine whether the legislature is authorized to enact a law, but rather to determine

whether our constitution prohibits the legislature's enactment of a law. This plenary power of the legislature is the rule for all purposes of civil government, and a prohibition to exercise a particular power is an exception. *Cathcart*, ¶ 45, 88 P.3d at 1067, citing *State ex rel. Bennett v. Barber*, 4 Wyo. 56, 32 P. 14, 16 (1893). This fundamental understanding is expressly declared in our constitution in Article 21, Section 14, which provides: "The legislature shall pass all necessary laws to carry into effect the provisions of this constitution."

[¶99] This Court has expressed unqualified recognition of the plenary power of the legislature since early statehood.

> The people of a State, in framing their constitution, committed to the legislature the whole lawmaking power of the State, which they did not expressly or impliedly withhold. Plenary power in the legislature is the rule, for all purposes of civil government, and a prohibition to exercise a particular power is an exception. . . . [E]very subject within the scope of civil government is liable to be dealt with by the legislature.

*Barber*, 32 P. at 16. It is only when the legislature exercises its plenary power beyond permissive limits that the Court may overturn legislation; otherwise, "the Court has no alternative but to uphold what is done." *School Districts Nos. 2, 3, 6, 9, and 10, in the County of Campbell v. Cook*, 424 P.2d 751, 759 (Wyo. 1967). Thus,

> [w]hen a state law is attacked upon the ground that it is in violation of the Constitution, it is presumably valid, and this presumption is a conclusive one, unless in the Constitution . . . , we are able to discover that it is prohibited. *** The lawmaking power of the state, it is said . . ., recognizes no restraints and is bound by none, except such as is imposed by the Constitution.

*State v. Johnson County High School*, 43 Wyo. 494, 5 P.2d 255, 261 (1931), quoting Cooley, Constitutional Limitations (8th ed.) 241.

**APPLICATION OF RULES TO WYOMING CONSTITUTIONAL PROVISIONS**

[¶100] It is within the framework of the above fundamental rules that this Court must consider the constitutional provisions at issue in this challenge to SEA 0001. Rather than viewing a particular constitutional provision in isolation, we must consider **all** provisions relating to the same subject matter *in pari materia*. *Barlow*, ¶ 18, 301 P.3d at 83. We must determine whether SEA 0001 is a proper exercise of the legislature's plenary power

47

or whether the constitution prohibits it, keeping in mind that the exercise of plenary power is the rule and prohibition the exception. *Cathcart*, ¶ 45, 88 P.3d at 1067. We begin our analysis with the relevant constitutional provisions.

[¶101] The framers of the Wyoming Constitution first addressed the subject of education in Article 1, "Declaration of Rights." Section 23 of that article states:

> The right of the citizens to opportunities for education should have practical recognition. The legislature shall suitably encourage **means and agencies** calculated to advance the sciences and liberal arts.

(Emphasis added.) The plain language of this provision indicates the framers recognized in principle that the citizens of the State had a right to educational opportunities and they intended the legislature to act to put that right into practical effect.

[¶102] The framers next addressed the subject of education in Article 7, entitled "Education; State Institutions; Promotion of Health and Morals; Public Buildings." Of those matters, the framers focused first on education:

### § 1. Legislature to provide for public schools.

> The legislature shall provide for the establishment and maintenance of a complete and uniform **system** of public **instruction**, embracing free elementary schools of every needed kind and grade, a university with such technical and professional departments as the public good may require and the means of the state allow, and such other institutions as may be necessary.

(Emphasis added.) The plain language of this section indicates the framers intended there to be a **system** of public **instruction**, that is, teaching, in the State and that they intended the legislature to provide for the creation and maintenance of that system.

[¶103] The framers again addressed the subject of education in the final section of the last article of the constitution, Article 21, stating:

### § 28. Legislature to provide for public schools.

> The legislature shall make laws for the establishment and maintenance of **systems** of public **schools** which shall be

48

> open to all children of the state and free from sectarian control.

(Emphasis added.) The plain language of this provision indicates the framers intended there to be **systems** of public **schools** in the State and that they intended the legislature to provide for the creation and maintenance of those systems.

[¶104] In three separate articles of the constitution, the framers charged the legislature with providing for the creation and maintenance of systems of public schools and a system of public instruction and with encouraging means and agencies to make educational opportunities available in the State.[23] The plain language of these provisions leaves no doubt that the framers intended the legislature to have broad responsibility for creating a statewide educational system in Wyoming. Reading the provisions *in pari materia*, no other conclusion can be drawn.

[¶105] Consistent with the framers' intent, this Court has consistently held that the legislature is in charge of the state's school system. *See Powder River Cattle Co. v. Board of County Comm'rs, Johnson County*, 3 Wyo. 597, 29 P. 361, 363 (1892), recognizing it is within the province of the legislature to make education a matter of state or county concern, management and control; *State ex rel. Wyoming Agricultural College v. Irvine*, 14 Wyo. 318, 84 P. 90, 102, 106 (1906), characterizing the legislature's constitutional duty to provide for education as "unrestrained," and "its authority supreme;" *Chicago B&Q R. Co. v. Byron Sch. Dist. No. 1*, 37 Wyo. 259, 260 P. 537 (1927), recognizing that the constitution charges the legislature with providing for a complete and uniform system of public instruction; *School District No. 2 in Teton County v. Jackson-Wilson High School Dist.*, 49 Wyo. 115, 52 P.2d 673, 676 (1935), quoting with approval cases stating that education is subject to the control of the legislature and legislative power with respect to public schools is supreme; *Goshen Co. Comm. College Dist. v. Goshen Co. Sch. Dist. No. 2*, 399 P.2d 64, 65-66 (Wyo. 1965), stating "the legislature has blanket authority and unlimited constitutional power" to provide for the

---

[23] Other provisions also demonstrate the framers' intent that the legislature was to be responsible for making education available in the state. Art. 7, § 2 authorized the legislature to apply a percentage of royalties earned on school lands to support the public schools. Art. 7, § 4 made the legislature responsible for the investment of county school funds and appropriating the income received from the investments to support the public schools. Art. 7, §§ 6 and 7 provided that the legislature was responsible for the investment of school trust funds and application of the income from such investments to support the public schools. Art. 7, § 8 required the legislature to provide for equal allocation of the income from the school trust fund among the school districts. Art. 7, § 9 required the legislature to make further provision through taxation or otherwise to create and maintain public education in the state and to impose mandatory attendance requirements. Art. 7, § 17 required the legislature to prescribe laws for the management of a state university and the powers and duties of university board of trustees.

establishment and maintenance of a complete and uniform system of public instruction; *Washakie Co. Sch. Dist.*, 606 P.2d at 320, stating "the legislature has complete control of the state's school system in every respect;" *Laramie Co. Sch. Dist. No. One v. Muir*, 808 P.2d 797, 802 (Wyo. 1991), stating the mandate in Art. 7, § 1 "articulates a sovereign function of the state" and "the method which the legislature has chosen to satisfy the constitutional mandate has been the creation of a state department of education, a state board of education, and local school districts;" *Campbell Co. Sch. Dist. v. State*, 907 P.2d 1238 (Wyo. 1995), stating the constitution places with the legislature the duty to provide a quality education in a manner, and at a level, that maintains "a complete and uniform system of public instruction" and a "thorough and efficient system of public schools, adequate to the proper instruction of all youth of the state;" *Campbell County Sch. Dist. v State*, 2008 WY 2, ¶ 14, 181 P.3d 43, 48, 51 (Wyo. 2008), stating the constitution entrusts the legislature with defining, developing, and implementing a thorough and efficient education system and determining the kind of education Wyoming's children will be afforded.

[¶106]  In addition to the provisions making the legislature responsible for creating and maintaining an educational system in the state, the framers made provision for elected state officers, including a superintendent.  Art. 4, which deals with the Executive Department, provides:

### § 11. State officers; election; qualifications; terms.

There shall be chosen by the qualified electors of the state at the times and places of choosing members of the legislature, a secretary of state, auditor, treasurer and **superintendent of public instruction**, who shall have attained the age of twenty-five (25) years respectively, shall be [a] citizen of the United States, and shall have the qualifications of state electors.  They shall severally hold their offices at the seat of government, for the term of four (4) years and until their successors are elected and duly qualified. **The legislature may provide for such other state officers as are deemed necessary.**

(Emphasis added.)  The plain language of this provision demonstrates that the framers intended there to be (in addition to a governor[24]) four elected state offices and for the superintendent to be one of those offices.  The plain language of § 11 also indicates the framers intended the legislature to have the authority to create other state officers as

---

[24] Election of the governor is provided for in Art. 4, § 3.

50

necessary. In the case of any additional state officers the legislature might find it necessary to create, the framers did not require that they be elected or serve any particular term.

[¶107] Article 4 further provides:

### § 12. State officers; powers and duties.

> The powers and duties of the secretary of state, of state auditor, treasurer and superintendent of public instruction shall be as prescribed by law.

The phrase "prescribed by law" means by the legislature. *State v. Heiner*, 683 P.2d 629, 648 (Wyo. 1984). *See also Mau v. Stoner*, 14 Wyo. 183, 83 P. 218, 220 (1905), holding that the phrase "'as may be prescribed by law' refers to and limits all the powers conferred by the section; in other words, prescribes how the exercise of these powers may be regulated and limited by the legislature;" *Baker v. Paxton*, 29 Wyo. 500, 215 P. 257, 267 (1923), holding that the phrase "prescribed by law" confers upon the legislature the power to enact such measures as it deems proper and "whatever method is reasonably adapted to the purpose mentioned may be chosen."[25] The plain language of Art. 4, § 12, therefore, indicates that the framers intended the legislature to enact supplemental legislation establishing the powers and duties of the four state offices, including the office of the superintendent, and setting forth how those powers and duties were to be performed.

[¶108] Article 7 further provides:

### § 14. Supervision of schools entrusted to state superintendent of public instruction.

> The **general supervision** of the **public schools** shall be entrusted to the state superintendent of public instruction, whose powers and duties shall be prescribed by law.

---

[25] The majority opinion contains a lengthy discussion of *Mau* and asserts that "our precedent has limited [the holding] to the very narrow fact situation presented in that case." While some of the majority's assertions about *Mau* may be correct, they are not pertinent to the matter at hand. What is important about *Mau* and the other cases in which this Court has addressed the meaning of the words "prescribed by law" is that they authorize the legislature to say how a particular power will be exercised. Clearly, the legislature cannot prescribe away the role the framers entrusted to a particular office or branch of government, but when the powers and duties of the office or branch are to "be prescribed by law," the legislature has the authority to determine those powers and duties.

The plain language of the first clause indicates that the framers intended the superintendent to have general supervision of the public schools. The plain language of the second clause indicates that the framers intended the legislature to enact supplemental legislation defining the superintendent's powers and duties of general supervision of the public schools. Art. 7, § 14 requires legislation to put it into effect and is, therefore, not self-executing. Because it is not self-executing, the legislature may act to implement Art. 7, § 14 and may qualify the provision.

[¶109] It is apparent from the above constitutional provisions that the entire constitutional scheme for education spoke to the future. The framers used language like "shall be entrusted," "shall provide for," "shall encourage," and "shall be prescribed," clearly envisioning a state educational system that would evolve over time as the legislature made suitable provision for creating it, putting it into effect and maintaining it. Rather than prohibiting the legislature from acting, the framers clearly intended the legislature to act to put the system into effect and maintain it.

[¶110] It is also apparent from the above provisions that the framers contemplated very different roles for the legislature and the superintendent. In Art. 7, § 1 and Art. 21, § 28, the framers required the legislature to provide for the establishment and maintenance of a **system** of public instruction and **systems** of public schools. In contrast, in Art. 7, § 14 they entrusted the function of general supervision of the **public schools** to the superintendent while requiring the legislature to determine the powers and duties necessary to carry out that function. Clearly, the framers intended the legislature to be responsible for the **system** or **systems** related to education while they intended something very different for the superintendent. Had they intended the superintendent's powers and duties to encompass the **systems** relating to education, they would have said so, just as they did in the provisions addressing the legislature's responsibility. Instead, they entrusted the superintendent with general supervision of the **public schools** and required the legislature to determine what powers and duties were necessary to fulfill that role.

[¶111] At the time the framers were drafting the constitution, the word "general" was defined as: "1. The whole; the total; that which comprehends or relates to all, or the chief part; -- [as] opposed to *particular*." Webster's International Dictionary of the English Language, 618 (1890). The word "supervision" was defined at the time as: "The act of overseeing; inspection; superintendence; oversight." *Id*. at 1448. Giving the words used in Art. 7, § 14, their plain and ordinary meaning, the constitution can be interpreted to mean the framers intended to entrust the superintendent with oversight of the public schools and for the legislature to determine what powers and duties were necessary to carry out that role. Reading Art. 7, § 14, *in pari materia* with the other provisions involving education, the constitution can be interpreted to mean the framers intended the legislature to have broad responsibility for the state educational system, including

52

determining the powers and duties necessary to enable the superintendent to oversee the public schools.  The question, then, is whether the legislature in SEA 0001 has prescribed the powers and duties of the superintendent so as to enable the office to oversee the public schools.  Before turning to that question, it is helpful to place SEA 0001 in context historically with other legislation involving the state educational system and the superintendent.

## HISTORY OF LEGISLATION

[¶112]  When the Wyoming Territory was established in 1868, the superintendent was not designated as a territorial office.[26]  The office was not created until the first legislative assembly adopted the laws of the territory in October of 1869.  At that time, rather than making it a separate office, the legislative assembly assigned the territorial auditor to serve as *ex officio* superintendent.  1869 Wyo. Sess. Laws, p. 219.  Until 1872, the auditor performed the duties of his office and the duties the legislative assembly assigned to the office of superintendent, which included filing papers received from county school officials, keeping records of the business of the office, general supervision of the public schools, seeing that the school system was put into uniform operation, recommending textbooks, preparing forms, making rules, distributing school laws to the school districts, reporting annually to the legislative assembly concerning the condition of the public schools, distributing school funds among the counties and storing school books and documents in the territorial library.  *Id*. at 220-221.  During these years, as remained true well into the next century, the particulars of education and the public schools were handled locally by county and district boards and officials as well as qualified voters in the district who elected school officers and voted on sites for school houses and taxes to support the local schools.  *Id*. at 221-232.  Although county superintendents were required to report to the *ex officio* superintendent and the superintendent was entrusted with general supervision of the public schools, the superintendent had no authority over local boards or officials.

[¶113]  In 1871, by laws that took effect in 1872, the legislative assembly deleted entirely the provisions relating to the superintendent and for the next two years the office did not exist *ex officio* or otherwise.  1871 Wyo. Sess. Laws, Ch. 1, p. 105.  Without the office of superintendent, the county superintendents reported directly to the governor.  *Id*., Ch. 2.  Although the legislature reinstated the office of superintendent effective in 1874, it then assigned the duties of the office *ex officio* to the territorial librarian.  1873 Wyo. Sess.

---

[26] The territorial offices consisted of governor, secretary, United States attorney, collector of internal revenue, assessor of internal revenue, chief justice, two associate justices, surveyor general, register of land office, receiver of public moneys, delegate to congress, treasurer, auditor, three penitentiary commissioners and marshall.  1869 Wyo. Sess. Laws, iii.

Laws, p. 239. This was the status of the office until the Wyoming Constitution was ratified in 1889. From 1874 until 1889, the duties of the office remained essentially the same as they were in 1869 except the legislative assembly removed from the *ex officio* superintendent the responsibility for recommending textbooks and distributing school funds. The *ex officio* superintendent continued to have general supervision of the public schools. 1876 Compiled Laws of Wyoming, Ch. 103, p. 525.

[¶114] Thus, from 1869 until 1874, the legislative assembly wavered back and forth about whether a superintendent was needed at all and, if so, which territorial office might best serve *ex officio* in that capacity. The legislative assembly resolved the question in 1874 by assigning the limited duties of the office to the territorial librarian where they remained until statehood fifteen years later. Throughout territorial times, local boards and officials were responsible for managing education and administering the public schools. 1869 Wyo. Sess. Laws, pp. 221-231; *see also* Terrence D. Fromong, *The Development of Public Elementary and Secondary Education in Wyoming: 1869-1917* (1962) (unpublished Ph.D. thesis, University of Wyoming), pp. 21, 158, stating "much of the power for actual maintenance and administration of the local schools was left to qualified voters in the local district" while the *ex officio* superintendent "was invested with no real power." Under territorial laws, the *ex officio* superintendent served primarily as a repository for information concerning the public schools and a conduit for information between local school officials and the governor and legislative assembly.

[¶115] With the ratification of the Wyoming Constitution in 1889, the superintendent became one of five state elected offices the powers and duties of which were to be prescribed by law. Art. 4, § 11; Art. 4, § 12. Interestingly, the Act of Cong. August 9, 1888 (25 Stat. 393), which authorized the leasing of lands granted for the university, provided for a leasing board to be composed of the territorial governor, auditor and superintendent. There was no separate office of superintendent in 1888 (the territorial librarian served as *ex officio* superintendent) and this federal law, which preceded the adoption of the Wyoming constitution by just one year, may have influenced the framers' decision to include the superintendent as one of the state offices.

[¶116] In any event, it is clear from the Journals and Debates of the Constitutional Convention of Wyoming that the framers were in agreement that the legislature would be charged with establishing and maintaining an educational system in the State. Vol. 1 at 98. It is also clear that the framers were not in agreement about whether a separate state office of superintendent was necessary and, if so, what the duties or salary of the office should be. One delegate suggested the president of the university should also serve as superintendent of public instruction. *Id*. at 464. Another delegate wanted the superintendent's salary limited to $1,500 per year commensurate with the limited duties of the office and suggested that if the legislature chose to increase the duties of the office in the future, it could increase the salary at that point as well. *Id*. at 464. Still another

stated the superintendent should have a salary suitable to the office which, he represented, the convention's education committee foresaw as including traveling to "oversee the whole work of education in the state," promoting "in a general way education in the state," and serving as "the head of education" in Wyoming. *Id*.

[¶117] Comments of individual delegates cannot be considered as reflecting the intent of the framers as a whole. *Barlow*, ¶ 45, 301 P.3d at 90. However, it is significant that while none of the delegates questioned giving the legislature authority to provide for a system of public instruction and systems of public schools, their individual views varied widely about the importance and duties of a superintendent of public instruction. The level of disagreement during the debates simply does not support the majority's conclusion that the framers collectively intended an important role for the superintendent or that the office "should be at the helm of the state educational system." In fact, the framers never used the words "system" or "education" in the context of the superintendent. Instead, they used those words when addressing the legislature's responsibilities.

[¶118] Ultimately, the framers resolved their differences by agreeing to the language entrusting the superintendent with general supervision of the public schools and requiring the legislature to define the powers and duties necessary to fulfill that function. Art. 7, § 14. At the same time, they placed with the legislature the responsibility of providing for means and agencies to promote educational opportunities, a system of public instruction and systems of public schools. Art. 1, § 23, Art. 7, § 1, and Art. 21, § 28.

[¶119] Consistent with the constitutional scheme, the legislature has prescribed laws since the beginning of statehood to develop the educational system, including laws establishing the superintendent's powers and duties of general supervision. To illustrate, between 1890 and 1915, the legislature passed laws requiring the superintendent to serve on the state board of charities and reform and state board of land commissioners (1891 Wyo. Sess. Laws, Ch. 37, pp. 166, 168, and Ch. 79, pp. 332-33); work with publishers and school districts to provide free text books to public school students (1899 Wyo. Sess. Laws, Ch. 29, pp. 64-65); appoint members of the legislatively created state board of examiners and meet with the board to issue teachers' certificates (1899 Wyo. Sess. Laws, Ch. 70, pp. 136-137); serve *ex-officio* on the board of child and animal protection (1907 Wyo. Sess. Laws, Ch. 82, p. 134); revoke teachers' certificates under specified circumstances (1913 Wyo. Sess. Laws, Ch. 44, p. 35); prepare a course of study including courses specified by the legislature (*Id*., Ch. 53, p. 45); and prescribe rules for testing students' sight and hearing. (1915 Wyo. Sess. Laws, Ch. 127, pp. 190-91).

[¶120] Alongside the office of superintendent, the legislature throughout the State's history has prescribed laws creating boards, commissions and such other institutions and offices as it has deemed necessary to carry out its responsibilities for encouraging

educational opportunities and providing for systems of public instruction and schools. In 1899, the legislature established the board of examiners and charged it with preparing and holding teachers' examinations, making teacher recommendations, and meeting annually with the superintendent to issue teachers' certificates. 1899 Wyo. Sess. Laws, Ch. 70, pp. 136-137. Although the legislature required the superintendent to meet with the board of examiners to issue the certificates, the legislature did not make the superintendent a member of the board, which prepared and held the examinations and made recommendations independently of the superintendent. In 1915, the legislature established the school code committee and charged the committee with investigating the needs of the public schools and recommending revisions to the school laws. 1915 Wyo. Sess. Laws, Ch. 157, p 239. The legislature required the superintendent to serve on this committee. As a result of the school code committee's work, the legislature in 1917 created the state department of education, the state board of education and an appointed office of commissioner of education and delegated to each of them duties relating to education, public instruction and the public schools. 1917 Wyo. Sess. Laws, Ch. 120, pp. 201-208.[27] That same year, the legislature abolished the board of examiners and transferred its duties to the board of education. *Id.*, p. 204.

[¶121] As the majority points out, one result of the school code committee's work was the promulgation in 1917 of laws that for the first time since territorial days took the responsibility for general supervision of the public schools away from the office of superintendent and entrusted that responsibility to the newly created department of education. 1917 Wyo. Sess. Laws, Ch. 120, pp. 201 and 203. The 1917 law also created a board of education to be "at the head" of the department of education and to "administer the State system." *Id*. Additionally, the law established the office of commissioner of education to serve as the executive officer of the board of education. *Id.* Under the law, the superintendent served as an *ex officio* member of the board of education and had authority to call special meetings of the board. The superintendent

---

[27] Among the duties the legislature delegated to the board of education in 1917 were to: appoint the commissioner; prescribe policies of educational administration throughout the State, and recommend rules and regulations for the administration of the public school system; consult with and advise through the commissioner, local boards of education, school officials teachers and citizens, and seek to develop public support for progressive education; prescribe standards regulating the general course of study for the public schools; provide for the grading and standardization of public schools, and enumerate minimum standards with which public schools must comply; prescribe rules for administering the laws governing certification of school officials; provide for an annual census of all school children; report biennially to the governor and legislature a complete statement of the works of the education department, including financial statements, educational progress, and needs of the school system and recommend school legislation and appropriations; conduct investigations regarding educational needs and progress and means of improving conditions; and assume the duty of preparing and holding teachers' examinations and making teacher recommendations that was previously assigned to the board of examiners. *Id*., pp. 203-04.

56

also had authority to approve textbooks that were not on the commissioner's approved list. *Id.*, p. 202, 206. The legislature delegated all other duties relating to education, public instruction and the public schools to the department, the board and/or the commissioner. Although the legislature amended the law in 1919 to transfer the duty of general supervision of the public schools back to the superintendent, it retained the department, board and commissioner of education all with responsibilities for the essence of the education system including standards for and certification of teachers and the course of study for students. 1919 Wyo. Sess. Laws, Ch. 127, pp. 180-187. Thus, since early in the state's history, the legislature has distributed substantial duties relating to education and the public schools to entities and officials other than the superintendent.

[¶122] The majority makes much of the fact that the legislature in 1919 not only transferred general supervision of the public schools back to the superintendent but charged the office (for the first time in the State's then twenty-nine year history) with administering the state system and exercising general control of the public schools. The majority concludes this is consistent with Art. 7, § 14, in which, the majority asserts, the framers charged the superintendent to "administer the statewide system of education." This conclusion is not supported by the text of the constitution. The framers did not use the word "administer," nor did they entrust the superintendent with any authority over "the statewide system of education." Again, the words "education" and "system" do not appear in any provision involving the superintendent. That the framers knew how to use those words is evident in Art. I, § 23, Art. 7, § 1 and Art. 21, § 28 in which they made the legislature responsible for providing opportunities for "education" and for providing a "system" of public instruction and "systems" of public schools. Similarly, that the framers knew how to use the word "manage" is reflected in Art. 7, § 17, in which they charged the legislature with providing by law for the "management" of the university by a board of trustees. The fact that the framers did not use these words when providing for the office of superintendent has meaning.

[¶123] It is also important to note that when the legislature transferred general supervision of the public schools back to the superintendent in 1919, it did not designate the office of superintendent to be "at the head" of the department of education. While the 1917 law designated the board of education as the head of the department, the legislature in 1919 took the language concerning "the head" of the department out of the statute. The deletion of this language suggests a specific intention on the part of the legislature not to place the superintendent at the head of the department of education.

[¶124] Contrary to the majority's conclusion, the 1919 legislation shows nothing more than the legislature's belief that it could not assign "general supervision of the public schools" to someone other than the superintendent. The plain language of the constitution and the historical record demonstrate that the legislature clearly is authorized to define, and throughout the State's history has defined, what constitutes the function of

57

"general supervision of the public schools" and has assigned those duties to the superintendent while assigning the essence of education, public instruction and the public schools to an array of other legislatively created entities and offices, as authorized by Art. 1, § 23 ("the legislature shall suitably encourage means and **agencies** calculated to advance" education) and Art. 4, § 11 ("the legislature may provided for such **other state officers** as are deemed necessary").

[¶125]  Moreover, even as it assigned the task of "administer[ing] the state system" to the superintendent in 1919, the legislature required the board of education to assist in prescribing policies and recommending rules for the administration of education in the State.  *Id*., pp. 180, 183.  Thus, the superintendent was not solely in control of administering the state system. Additionally, while giving the superintendent "general control" of the public schools, the legislature gave the board of education the power to prescribe standards regulating the general course of study in public schools, provide for the grading and standardization of public schools, prescribe reading courses for teachers and prescribe rules for administering the laws governing certification of public school officials and teachers.  *Id*., pp. 181, 183.  These duties constituted the essence of the educational system.  Although the superintendent had a voice by virtue of membership on the board of education, the superintendent was never solely in control of the public schools just as the office never solely administered the system and was not the "head" of the department of education. [28]

---

[28] The following summary illustrates the division of other duties between the superintendent, board of education and commissioner in 1919. The 1919 laws required the superintendent to consult with the commissioner and local boards, superintendents and others; explain the school laws; resolve disputes; enforce the school laws; furnish contract forms to and accept bonds from publishing houses; work with the state board to conduct an annual census of school children; report biennially to the governor and legislature concerning the complete work of the department of education; assume the duties of the board of examiners; supervise the commissioner of education; and issue and revoke teacher certificates.  1919 Wyo. Sess. Laws, Ch. 127, pp. 180-187.

The 1919 laws gave the state board of education authority to institute legal proceedings in the name of the State and required it to advise the superintendent concerning the annual census; exercise general oversight of vocational and other special schools; report biennially to the governor and the legislature on the complete works of the education department with recommendations; appoint with the governor's approval the commissioner of education; conduct investigations regarding educational needs, progress and means of improvement; and recommend issuance of teaching certificates. *Id*., pp. 181-186.

The commissioner of education's duties under the 1919 laws were to execute the policies of the board of education; stimulate public interest in education and inform the public on policies; tour and inspect the counties for discussion of questions concerning public education; foster professional growth and enthusiasm in teachers and school officials; examine the expenditures, accounts and educational and administrative methods of local boards and superintendents, and advise them on school system management; prepare and submit for approval by the state board a suggested course of study; prepare

[¶126] By 1920 the means the legislature had chosen to satisfy the mandate given to it by the framers was to create a state department of education, state board of education and commissioner of education and distribute tasks associated with education and the public schools among them and the superintendent. In some cases, the responsibilities of one office or entity intertwined with those of another. As a practical matter, however, the county superintendents and district boards remained very much in control of educational matters on a local level.

[¶127] Over the course of subsequent decades, as the task of providing adequate and equal educational opportunities and a complete and uniform system of public instruction and systems of public schools became increasingly challenging, the legislature assigned more and more duties to the superintendent and the board of education. At the same time, the legislature created boards, commissions, task forces, councils and other entities and assigned each of them tasks relating to education and the public schools. Some of those tasks were managerial. Others were administrative. Still others gave the particular board or commission "control" over some aspect of education, public instruction or public schools. The legislature required the superintendent to serve on some of those boards and not on others. The legislature also restructured the state education system several times and assigned, transferred and re-assigned responsibilities for education and the public schools to the department of education, board of education, superintendent, commissioner of education (until the office was abolished in 1959), county superintendents (until they were abolished in 1969) and the numerous boards, commissions and other entities it has created in its effort to satisfy the constitutional mandate.[29]

---

regulations for standardizing and grading public schools; print and distribute school laws and forms for reports; require annual reports from local officials; with the state board publish approved text books and conduct investigations; act as chief officer of the certification division; conduct the state teacher's employment bureau; and keep lists of all teachers employed in the state. *Id*., pp. 184-185.

[29] Between 1920 and 1960, the legislature assigned the following tasks to the board of education: seeing that courses on the state and federal constitution and American government were taught in all schools (1924 Wyo. Sess. Laws, Ch. 94, p. 99); responsibility for funds deposited in the school equalization fund and directing the superintendent to distribute them (1939 Wyo. Sess. Laws, Ch. 94, p. 155); administering the federal aid to public education act (*Id*., Ch. 95, p. 158); appointing a state committee for the reorganization of school districts (1947 Wyo. Sess. Laws, Ch. 163, p. 213); adopting rules to effectuate the legislature's public school foundation program (1955 Wyo. Sess. Laws, Ch. 119, p. 121); administering the Wyoming higher education loan plan (1959 Wyo. Sess. Laws, Ch. 49, p. 48) and assuming the commissioner of education's duties to distribute school laws and forms, receive reports from local school officials, publish lists of approved textbooks, maintain teacher lists and investigate needs and ways to improve education. *Id*., Ch. 109, pp. 121-123.

[¶128] In 1951, the legislature created the community college commission and delegated authority to it to address the needs of the community colleges. 1951 Wyo. Sess. Laws, Ch. 14, p. 316. In 1959, the legislature created the Wyoming statute revision committee and charged it with revising the school laws. *Id.*, Ch. 169, p. 231. The legislature required the superintendent to serve on the community college commission but did not make the superintendent a member of the statute revision committee. In 1959, the legislature abolished the certification division of the board of education and transferred its duties, some to the superintendent and some to the board of education. 1959 Wyo. Sess. Laws, Ch. 109, p. 123.

[¶129] In 1969, as a result of the work of the Wyoming statute revision committee, the legislature enacted the Wyoming Education Code of 1969, the first major restructuring of the state system since 1919. 1969 Wyo. Sess. Laws, Ch. 111, p. 148. It provided for

> a separate and distinct . . . state department of education which shall consist of the state superintendent, the state board, and such divisions . . . as the state superintendent with the approval of the state board shall determine necessary to assist him and the state board in the proper and efficient discharge of their respective duties.

*Id.*, Section 7, p. 149. Thus, the 1969 Code retained a division of duties pertaining to education between the department of education, board of education and superintendent. It further provided:

> The general supervision of the public schools shall be entrusted to the state superintendent who shall be the administrative head and chief executive officer of the department of education.

*Id.*, Section 9, p. 149. With this provision, the legislature for the first time in the State's seventy-nine year history designated the superintendent as the head and chief executive

---

The legislature charged the superintendent with: supervising the board of education's distribution of emergency aid to education funds (1945 Wyo. Sess. Laws, Ch. 159, p. 197); serving on the state committee for the reorganization of school districts (1947 Wyo. Sess. Laws, Ch. 163, p. 213); performing an allotment of classroom units in each district, certifying the amounts payable to each district and distributing funds from the school foundation fund (1955 Wyo. Sess. Laws, Ch. 119, pp. 121-123); and serving as executive director of the Wyoming higher education loan plan under the direction of the board of education (1959 Wyo. Sess. Laws, Ch. 51, pp. 48-49).

officer of the department of education. Although the 1919 law charged the superintendent with administering the state system of public schools, the legislature had never before designated the office as being the head of the department. In fact, from 1919 until 1969, no office or entity was designated as head of the department. Rather, the legislature during those years distributed duties relating to the department to the board of education, superintendent, commissioner and such other offices and entities as it deemed necessary to create. For most of the state's history, therefore, the superintendent was not the head of the department.

[¶130] The legislature also in 1969 assigned other duties to the superintendent and the board of education[30] and abolished the office of county superintendent, which had played such a significant role in the public school system since territorial days. *Id.*, p. 192. The legislature assigned the tasks previously assigned to the county superintendents to the district boards of trustees and county treasurer. *Id.*, Ch. 9, Sec. 176, p. 193. The legislature also in 1969 made the superintendent an *ex officio* non-voting member of the board of education. *Id.*, p. 150.

[¶131] Since 1969, the legislature has continued to divide responsibilities for education and the public schools between the board of education, the superintendent and such other

---

[30] Among the duties the legislature assigned to the superintendent were: making rules for effective administration of the educational system, except in areas entrusted to the board of education; consulting with and advising the board of education and local school officials and interested citizens, and seeking to develop public support for a complete and uniform system of education in Wyoming; maintaining adequate files and records; enforcing the 1969 Code and rules; deciding controversies arising from the administration of the state school system involving rules or orders of the superintendent, department or board of education; serving as an *ex officio* non-voting member of the board of education; assisting the state board in performing its duties. [*Id.* pp. 149-150] The office of superintendent also maintained its responsibilities with respect to the school foundation fund under the 1969 Code. *Id.* pp. 204, 207.

The legislature required the board of education to: prescribe minimum standards for general education programs and public school site selection, building, construction, evaluation and accreditation; with or without the superintendent's assistance, enforce rules adopted for prescribing minimum standards; prescribe rules for administering laws governing certification of school administrators, teachers and other personnel; prepare and maintain a list of approved institutions whose graduates may receive certification and providing for the issuance of Wyoming certificates; maintain placement lists of all teachers employed in Wyoming and other teachers in or out of state who wish to register with the department; conduct investigations concerning educational needs and means of improving conditions; provide a uniform system of cost accounting and reporting of school district income and disbursement; revoke or suspend certifications; require reports or other assistance from local school boards and officials. *Id.* 151-52. The legislature required both the board of education and the superintendent to report biennially to the governor and legislature with recommendations for legislation and appropriations pertaining to education. *Id.*

boards and commissions as it has deemed necessary to establish and meet the constitutional mandate to make education available and maintain a system of public instruction and schools. In 1980, in response to this Court's holding in *Washakie County Sch. Dist.,* 606 P.2d 310 that the State's system of financing public education was unconstitutional the legislature revised the school finance statutes. 1983 Wyo. Sess. Laws, Ch. 136, p. 387. The revisions required the board of education with the advice of the superintendent to adopt rules for carrying out the purposes of the revised statutes. *Id.,* p. 390. The legislature also required the superintendent and board of education to report annually to the legislature and governor concerning the operation of the foundation program. *Id.,* p. 391. The legislature charged the superintendent with determining the tentative allotment of foundation funds to which each district was entitled. *Id.,* p. 398. The board of education was required to adopt rules for the distribution of foundation funds. *Id.*

[¶132] In 1987, the legislature charged the board of education with among other duties establishing "policies for public education in this state consistent with the Wyoming Constitution and statutes" and authorized it to promulgate rules necessary to implement its responsibilities under the 1969 Code. 1987 Wyo. Sess. Laws, Ch. 190, p. 499.[31] In 1988, the legislature established a task force to evaluate the system for providing services to preschool handicapped children. 1988 Wyo. Sess. Laws, Ch. 97, p. 260. Although the legislature required the superintendent to serve on the task force, a chairperson was to be selected from among four legislative members of the task force. *Id.* In 1991, the legislature created the state advisory council for innovative education and charged it with determining distributions from the state education trust fund to public schools and other institutions. 1991 Wyo. Sess. Laws, Ch. 169, p. 385. Again, the superintendent was made an *ex-officio* member of the council but is not the head of it. *Id.,* p. 387. Two years later, the legislature created the Wyoming professional teaching standards board and gave

---

[31] The legislature also required the board of education to: direct the department of education to provide and enforce implementation by July 1, 1988, of a uniform system of cost accounting and reporting of school district income and disbursement; approve or disapprove alternative scheduling for school districts requesting to operate less than 175 days per school year; promulgate rules under which the SPI may accept and disburse federal funds for use in school lunch programs; promulgate rules to assure that handicapped children receive free and appropriate education; serve as an appeals board for school districts. *Id.* pp. 499-501. The legislature required the superintendent to: conduct studies to determine methods to improve school lunch programs and promote nutritional education in schools; inform the state board regarding applications from school districts to the farm loan board for loans or grants for capital construction; promulgate operational rules for the Wyoming school for the deaf; provide technical assistance to districts offering adult education. *Id.* p. 499. The legislature also transferred from the board of education to the superintendent the duty to maintain a list of institutions whose graduates may receive teacher certification and to print and distribute school laws, regulations, forms and reports to local boards and administrators. *Id.*

it the authority to determine standards for teacher certification. 1993 Wyo. Sess. Laws, Ch. 217, p. 628. The superintendent and the governor appoint the members but the superintendent does not serve on the board. In 1994, the legislature created the postsecondary education planning and coordination council to develop goals for postsecondary education and perform additional duties related to enhancing opportunities for quality postsecondary education. 1994 Wyo. Sess. Laws, Ch. 7, p 7. Today, the superintendent serves as vice-chair of the council.

[¶133] In the seventeen years that passed between this Court's 1980 ruling in *Washakie*, 606 P.2d 310, and the 1997 general session, the legislature made significant changes in education law in an effort to bring the state system into conformity with the constitution. Those changes brought ever increasing demands on the board of education and superintendent and led to the creation of new boards to assist in meeting those demands. When in *Campbell I*, this Court again found Wyoming's education laws unconstitutional the legislature convened a special session and attempted to address the problems by amending the Education Act. 1997 Wyo. Special Sess. Laws, Ch. 3, p. 4.

[¶134] During the special session, the legislature prescribed laws requiring the superintendent to collect information, develop recommendations and report back on a multitude of issues. 1997 Wyo. Special Sess. Laws, Ch. 3, pp. 12-15, 19, 22. The legislature also imposed new duties on the board of education. *Id*., pp. 23-24. Additionally, the legislature created a statewide design team to investigate and implement the statewide student assessment conducted by the superintendent on school district expenditures for children with disabilities. *Id*., pp. 16-17.

[¶135] In 1998, the legislature amended the statutes relating to school facilities to move some of the duties from the department of education to the superintendent. For example, the legislature required school districts to apply to the superintendent for capital construction grants or loans and required the superintendent to review and evaluate the applications and submit prioritized recommendations to the state loan and investment board. The legislature also required the superintendent to report to the legislature on facilities identified as inadequate, establish uniform statewide standards for the adequacy of school facilities and conduct a comprehensive assessment of the adequacy of school facilities. 1998 Wyo. Sess. Laws, Ch. 58, pp. 527-530. To assist the superintendent, the legislature created the capital construction advisory group. *Id*., p. 531.

[¶136] In 1999, the legislature further amended the school capital construction statutes to require the superintendent to report to a joint legislative committee the immediate statewide capital construction needs; districts with facilities identified as inadequate; districts not in compliance with items certified in their application for assistance; and, by the end of each year, progress being made under the school capital facilities system. 1999 Wyo. Sess. Laws, Ch. 170, p. 377-378. Additionally, the legislature required the

superintendent to submit annually to the governor and joint committee a list of all new projects eligible for state capital construction assistance, determine whether applications for assistance met specified criteria, promulgate rules for submission of applications in emergencies and forward such applications to the governor. *Id.*, pp. 382-84. The legislature designated the office of state lands to provide assistance to the superintendent in implementing these provisions. *Id.*, p. 384. The legislature also required the superintendent to prepare and submit to the governor a recommended budget for school capital construction financing. *Id*. Upon appropriation by the legislature from the school capital construction account, the superintendent was required to make expenditures for assistance, expend the proceeds of state revenue bonds, and provide capital construction financing for emergencies. *Id.*, p. 385. In order to ensure the availability to the school districts of adequate facilities, the superintendent was also authorized to lease land, buildings, equipment or other capital assets from the nonprofit corporation approved by the state building commission. *Id.*, p. 386.

[¶137] The extensive duties the legislature assigned to the superintendent in the late 1990s for matters involving school facilities was unprecedented in Wyoming history and was not a result of any constitutional directive that the superintendent be in charge of school facilities. Rather, it was a direct result of this Court's rulings in *Washakie* and *Campbell I*. In those cases (and the many others cited in paragraph 105 of this dissent), the Court held that the legislature had the duty to provide for education in every respect. At that time, the method the legislature chose to carry out the task was to impose additional duties on the superintendent while simultaneously creating the capital construction advisory committee and directing the office of state lands to assist the superintendent with specified tasks. When it became clear in 2002 with the issuance of *Campbell II* that the method it had chosen was not working, the legislature created the school facilities commission and charged it with a multitude of tasks relating to school facilities.[32]

---

[32] The legislature charged the school facilities commission with: adopting policies and standards for the comprehensive assessment of school facilities; adopting policies and standards for school district facility plans; establishing a consistent, systematic research approach for student enrollment projections used by districts in developing district facility plans and forecasting facility needs to comply with statewide building adequacy standards; developing guidelines for estimating the cost of constructing, renovating and remediating facilities to comply with statewide adequacy standards; establishing a statewide school facilities database; developing policies and criteria for use in determining renovations, replacement or discontinuation of inadequate facilities; entering into construction or renovation project agreements with school districts; establishing criteria and procedures for identifying local enhancements to school facilities which are in excess of state building adequacy standards and develop criteria and procedures to determine whether and how any local enhancements should be incorporated into statewide adequacy standards; reviewing and approving district plans for the disposition or demolition of facilities made surplus by an approved construction or renovation project or by changes in school population; establishing a procedure for developing prototypes for remedies addressing facility inadequacies; developing criteria and

64

[¶138]  Just as it did in 1917 when it established the department, board and commissioner of education and delegated duties to them rather than to the superintendent, the legislature in 2002 established the school facilities commission and its director and delegated duties to them, some of which had been previously assigned to the superintendent.  Although the legislature required the superintendent to serve as an *ex-officio* non-voting member of the commission, it did not place the superintendent in charge of the commission.  The legislature spent over $2.5 billion under this process without involvement of the superintendent.  Wyo. Sch. Facilities Dep't., 2013 Ann. Rep. & 2015-16 Biennial Budget Request to the Governor, Sch. Facilities Comm'n & Select Comm. on Sch. Facilities (2013).

[¶139]  If the majority is correct that the framers intended the superintendent to be the administrative head of all aspects of education in the state, the legislature's creation in 2002 of the school facilities commission with its own director is unconstitutional.  Similarly invalid is legislation creating a statewide task force to measure student progress and investigate, assemble and recommend accountability processes to assist state efforts in addressing education accountability requirements of the No Child Left Behind Act (2003 Wyo. Sess. Laws, Ch. 164, p. 443; *Id*., Ch. 208, p. 552); designating the board of education and later the department of education as being responsible for private school licensing (2006 Wyo. Sess. Laws, Ch. 34, p. 67); creating a distance education task force (*Id*. Ch 147, p. 342);  requiring the governor to enter into negotiations with the Eastern Shoshoni and Northern Arapaho councils to determine the appropriate contractual arrangements for providing education programs and services addressing Indian students at risk of failure in school (*Id*., Ch. 200, p. 478).  Yet each of these laws had been passed in 2008 when this Court in *Campbell County School District v. State*, 2008 WY 2, 181 P.3d 43 (Wyo. 2008) upheld the state system as constitutional and said:

---

procedures for the site analysis of remedies responding to identified facility inadequacies by facility replacement; after consultation with the select committee on school facilities, promulgating necessary rules to administer the act. 2002 Wyo. Sess. Laws, Ch. 99, p. 293-295.

The legislature also charged the school facilities commission with: contracting with experts and professionals; employing a director subject to senate confirmation; establishing and maintaining uniform statewide standards for the adequacy of school facilities; maintaining the comprehensive assessment of the adequacy of existing school facilities, reviewing facility adequacy standards; reviewing and approving, modifying or rejecting facility plans submitted to it by each school district; evaluating the adequacy of school facilities and establishing a schedule for remediation, determining the most cost effective method of remediation; proceeding with projects authorized by the legislature; preparing and submitting to the governor a recommended budget for projects and school capital construction financing; promulgating rules for determining when an emergency exists and making expenditures for emergency funding; reporting annually to the select committee on school facilities; distributing major facility repair and replacement payments to each school district. *Id*., pp. 297–304, 308.

The Wyoming constitution entrusts the Wyoming legislature with defining, developing and implementing a thorough and efficient education system. The legislature, in reliance upon research and information from its agencies, consultants, local school districts, educators and parents, enacted statutes to correct the deficiencies in the state school system. Some of those statutes produced legitimate legal challenges. We issued significant decisions in 1995 and 2001 clarifying the constitutional mandate to be met by legislation. Since then, and continuing today, the legislature has generously responded to our decisions and its constituency by developing and refining a comprehensive, sophisticated system that meets the complex demands of delivering a thorough and efficient education to the individualized needs of Wyoming students in the 21st century.

. . . .

This Court is satisfied that the legislature has in place a thorough and efficient educational structure funded from state wealth as required by our state constitution.

*Id*., ¶¶ 2, 4, 181 P.3d at 48.

[¶140] Since this Court's ruling, the legislature has continued to prescribe laws designed to develop and refine "a comprehensive, sophisticated system that meets the complex demands of delivering a thorough and efficient education to the individualized needs of Wyoming students in the 21st century." *Id.*. ¶ 2, 181 P.3d at 48. Notably, in 2011, the legislature reorganized the school facilities commission by creating a school facilities department under the supervision of the commission. 2011 Wyo. Sess. Laws, Ch. 2, p. 3. The department consists of a director who is appointed by and serves at the pleasure of the governor with the advice and consent of the senate. *Id.* The director is the chief administrative officer of the department with general supervision and control of all activities and employees of the department. *Id*., pp. 3-4.

[¶141] Also in 2011, the legislature passed the education accountability act. *Id*., Ch. 184. It required the board of education to implement and enforce the accountability system and require school district adherence to the system. *Id*., p. 496. The legislature created a select committee on statewide education accountability consisting of members of the senate and house and provided for an advisory committee to assist the select committee. *Id*., p. 500. The superintendent does not serve on the committee and appoints only one of its twelve members. *Id*., pp. 500-501. The act requires the superintendent (and the board of education) to perform various duties; however, the superintendent

clearly does not serve as the administrative head under the act. In 2012 amendments to the education accountability act, the legislature required the board of education to compile, evaluate and determine target levels for school performance ratings, establish and administer a progressive multi-tiered system of support, intervention and consequences to assist schools, describe the performance of each school and establish a reporting system, annually review the statewide education accountability system and report annually to the legislature. *Id*., Ch. 101, pp. 328-333. The legislature charged the superintendent with taking action based upon system results and reporting annually to the board of education on the progress of schools in meeting annual goals. *Id.*, pp. 330, 332. The legislature created the education accountability professional judgment panel to assist the board of education in preparing its report. *Id.*, p. 342. The superintendent does not serve on the panel.

[¶142] It is within this historical context that the legislature passed SEA 0001. *See* Appendix 1, State of Educational System Prescribed by the Legislature depicting the responsibilities of various entities for education since statehood. We turn now to address the Act and to the question whether it is constitutional.

## CONSTITUTIONALITY OF SEA 0001

[¶143] In considering the challenge to the constitutionality of SEA 0001, we must proceed with great caution, examine the question in every possible aspect and not declare the Act invalid unless its invalidity is beyond reasonable doubt. *Cahill*, 75 P. at 442. We must begin with the presumption that it is constitutional and may not hold it otherwise unless that conclusion is unavoidable. *Merbanco,* ¶ 32, 70 P.3d at 252. Because we have concluded that Art. 7, § 14 is not self-executing, we must if possible construe the legislation enacted supplementary to it in a manner consistent with the constitution and may defer to the legislature. *Burton,* 107 P. at 396; Williams at 344. We also must be mindful of the legislature's plenary power, recognizing that the exercise of that power is the rule and prohibition the exception. *Cathcart*, ¶ 45, 88 P.3d at 1067.

[¶144] SEA 0001 expressly entrusts the superintendent with general supervision of the public schools and authorizes the office to adopt rules and regulations to enable it to effectively carry out that duty. Wyo. Stat. Ann. § 21-2-201. Thus, the legislature has given the superintendent the power to make rules to satisfy the role the constitution entrusts to the office. Although the legislature has delegated numerous duties to the department, the board and director of education and the superintendent may not adopt rules in the areas delegated to them, no other entity or office is entrusted with general supervision of the public schools. Likewise, the superintendent is the only office that can adopt rules enabling it to generally oversee the public schools from a statewide perspective.

67

[¶145]   The current law also requires the superintendent to report annually to the legislature "on the general status of all public schools."  The legislature specified that the report must address "the quality of education including any proposed improvement to address any shortfalls, the relevance of education, the measurement of achievement of educational goals, the improvement of learning and any suggested innovations in education."  The topics the legislature has required the superintendent to address in the report provide guidance as to what "general supervision of the public schools" means.  In order to prepare the report, the superintendent must know what the public schools are doing, whether they are meeting educational goals and how learning might be improved.  The superintendent also must have an understanding of how the state's educational system is responding to a rapidly changing world and keep abreast of new ideas and methods in education.  The knowledge and awareness the superintendent is required to have can only be gleaned by general (statewide) supervision (oversight) of the public schools.

[¶146]   The law also enables the superintendent to provide oversight by requiring the office to identify professional development needs for public schools and teachers statewide, establish a plan to address those needs, contact expert assistance and conduct annual workshops to provide professional development to teachers and the public schools.  Involvement in the professional development of teachers and public schools across the state is a hugely important piece of overseeing the public schools.  The other duties the legislature assigned to the superintendent – implementing the teacher of the year program and working with school districts on the use of seclusion and restraint, protocols for addressing head injuries and safe storage and disposal of hazardous substances are also significant pieces of the statewide oversight function.

[¶147]  In addition to these duties, the superintendent under the SEA 0001 retains duties prescribed by the legislature in prior years, including the duty to make budget requests, report to the governor each fiscal year concerning the department of education's programs, objectives, activities and condition and recommend legislation concerning education and appropriations for educational activities.  Section 21-2-306.  Additionally, as has been the case since 1917, the current law assigns the superintendent the task of serving on the board of education (§ 21-2-301).  As a member of that board, the superintendent has a voice in the many responsibilities the legislature has assigned to it.[33]

---

[33] The duties the legislature has delegated to the board of education are the heart of education in Wyoming and include the duty to:  establish policies for public education in Wyoming; implement and enforce the uniform standards for educational programs prescribed under § 21-9-101; prescribe uniform performance standards for the common core of knowledge and skills specified in § 21-9-101(b) and promulgate uniform standards for programs addressing special needs students under § 21-9-101(c); report biennially to the governor and the legislature and make recommendations; conduct investigations within

68

[¶148] SEA 0001 also continues to require the superintendent to serve on a wide array of other boards and commissions including the community college commission (§ 21-18-201[34]), advisory council for innovative education (§ 21-22-103), education planning and development council (§ 21-16-601), school facilities commission (§ 21-15-113) and university board of trustees (§ 21-17-203). As a member of these boards and commissions, the superintendent is intimately involved in the duties the legislature has assigned to them. The superintendent also appoints with the governor members of the professional teachings standard board and, like the other state offices, serves on the board of land commissioners. Wyo. Const. Art. 18, § 3; Wyo. Stat. Ann. § 36-2-101.

[¶149] Given the above powers and duties provided to the superintendent, SEA 0001 is vastly different from the 1917 law the majority suggests was unconstitutional. Not only does SEA 0001 entrust the superintendent with general supervision of the public schools and authorize the office to adopt rules to effectuate that charge, which the 1917 law clearly did not, it also requires an annual report to the legislature that demands knowledge of the public schools that can only be obtained by knowing how they are performing. The report also requires the superintendent to be knowledgeable about innovations in education so as to be able to make recommendations for improvement. The Act further requires the superintendent's involvement in professional development in the public schools. Additionally, unlike in 1917 when the superintendent had virtually no duties other than serving on the board of education and the authority to call board of education meetings and approve textbooks not otherwise approved, the superintendent currently is required to serve on a wide array of boards and commissions in addition to the board of education, giving the office a unique statewide perspective of the public

---

and without the state regarding educational needs and progress and means of improving conditions; act as board of vocational education; establish improvement goals for public schools for assessing student progress; establish statewide goals for education; through the superintendent implement, administer and supervise education programs and services for adult visually and hearing impaired; implement and enforce the statewide accountability system; establish a requirement for students to demonstrate mastery of the common core of knowledge and skill in order to earn a high school diploma; and through the director implement a statewide assessment system; establish a program of administering a standardized, curriculum based achievement college entrance exam, computer-adaptive college placement assessment and job skills assessment test.

[34] The Community College Commission has broad authority over the community colleges in the state including general functions such as advocating community college education to the governor, legislature and others; coordination functions, such as coordinating the common course numbering system; administrative functions, such as disbursing state funds to the colleges; approval functions, such as approving all new capital construction projects in excess of $100,000.00; review and report functions, such as reviewing college districts and reporting to the governor and legislature; implementing functions, such as advancing collaboratively developed legislative proposals on behalf of the college system.

schools across the state and distinctive ability to oversee them. Under SEA 0001, the superintendent also continues to be required to make budget requests and recommend legislation and appropriations.

[¶150] When all of the duties and responsibilities of the superintendent are taken into account, SEA 0001 cannot fairly be said to marginalize the office and leave it an empty shell. Rather, the superintendent retains significant supervisory powers over the public schools across the state and is the only office charged with generally overseeing them. Although SEA 0001 transfers many duties to the director of education, as numerous other statutes have done over the years, it does not take away from the superintendent the essential role the framers intended the office to have. The legislation satisfies the constitutional mandate to the legislature to define the superintendent's powers and duties to generally supervise the public schools.

[¶151] If the presumption that the 2013 Act is constitutional is applied and all doubts are resolved in favor of that presumption as our jurisprudence directs, this Court must uphold the Act. The legislature has properly exercised its plenary power to enact laws supplementary to Art. 7, § 14, defining the superintendent's duties and "how such duties are to be performed." *Gould*, 101 P. at 940. The challengers in this case have not established that no set of circumstances exists under which SEA 0001 would be valid. The majority's conclusion that SEA 0001 is unconstitutional is not "clear, palpable, unavoidable or beyond a reasonable doubt" because, as the foregoing discussion demonstrates, the relevant constitutional provisions can be read together in a manner that results in upholding the Act. *Merbanco*, 70 P.3d at 252. Resolving all doubts in favor of constitutionality, this Court is duty bound to uphold the Act.

## SUPPORTING CASES FROM OTHER STATES

[¶152] In concluding that SEA 0001 is constitutional, we have considered cases from other courts that have reached similar results when interpreting their constitutions. In *Board of Education v. Booth*, 984 P.2d 639, 646 (Colo. 1999), the Colorado Supreme Court considered the first clause of the Education Article in the Colorado Constitution, which reads: "The general supervision of the public schools of the state shall be vested in a board of education whose powers and duties shall be as now or hereafter prescribed by law." *Id*. The court said:

> The primary definition of the term "general" is "involving or belonging to the whole of a body, group, class, or type: applicable or relevant to the whole rather than to a limited part, group, or section." Webster's Third New International Dictionary 944 (1986). During the constitutional convention, the framers specifically amended the Education Clause to

describe the State Board's supervision as "general" in nature. See Proceedings of the Constitutional Convention: Colorado 1875-1876, at 353 (1907). "Supervision," in turn, typically denotes "direction, inspection, and critical evaluation." Webster's 2296. Therefore, our definition begins with the presumption that the framers intended the State Board to provide direction, inspection, and critical evaluation of "the whole" in the sense of contributing a statewide perspective to decisions affecting public schools. This expectation is reflected in an election process that ensures statewide representation on the board. See Colo. Const. art. IX, 1(1); 22-2-105(1), 7 C.R.S. (1998) (providing for election of a member of the State Board from each congressional district).

Our understanding of "general supervision" is supported by the territorial legislature's use of the phrase at the time of its adoption into the Colorado Constitution. See *Marshall v. School Dist. RE # 3 Morgan County*, 191 Colo. 451, 453, 553 P.2d 784, 785 (1976) (relying on contemporaneous legislation to inform an understanding of the framers' intent regarding student access to free textbooks). Prior to statehood, the Territory of Colorado did not have a state board of education. Rather, it had a Territorial Superintendent of Public Instruction, County Superintendents for each county, and local boards of directors for individual districts. A primary duty of the Territorial Superintendent was "general supervision of all the County Superintendents and of all the public schools of the Territory." An Act to Amend, Revise and Consolidate the Acts Relating to Public Schools, sec. 3, 1876 Colo. Sess. Laws, 127, 128. Specific duties of the Territorial Superintendent included annual reports to the governor and legislative assembly, distribution of laws and regulations to the county superintendents, and distribution of any forms or certificates that the county superintendents were required to complete. *See id*.

Following statehood, the General Assembly continued to describe the State Superintendent as having "general supervision." In 1877 it elaborated on the Superintendent's characteristic responsibilities:

He shall, on or before the tenth day of December, in every

71

year preceding that in which shall be held a regular session of the general assembly, report to the governor the condition of the public schools . . . with such suggestions and recommendations relating to the affairs of this office, as he may think proper to communicate. It shall be his duty to visit annually such counties in the state as most need his personal attendance, and all counties, if practicable,  for the purpose of inspecting the schools, awakening and guiding public sentiment in relation to the practical interests of education, and diffusing as widely as possible, by public addresses and personal communication with school teachers and parents, a knowledge of existing defects, and of desirable improvements in the government and instruction of schools.

Colo. G.L. 2456, 10 (emphasis added). This enumeration indicates that general supervision required, first and foremost, that the superintendent serve as an intermediary between the state government and local authorities regarding the status of the public education system as a whole. He was required to inform the governor and the legislature regarding the condition of public education and to make recommendations for its improvement. In addition he was required to disseminate to public schools, his "knowledge of existing defects, and of desirable improvements." *Id*. Therefore, "general supervision" implied both descriptive and prescriptive roles. The superintendent served as a conduit for information regarding the school system's present state and as a source of ideas, recommendations and aspirations for its improvement.

We conclude that, pursuant to article IX, section 1(1), the constitutional framers contemplated general supervision to include direction, inspection, and critical evaluation of Colorado's public education system from a statewide perspective, that they intended the State Board to serve as both a conduit of and a source for educational information and policy, and that they intended the General Assembly to have broad but not unlimited authority to delegate to the State Board "powers and duties" consistent with this intent. Colo. Const. art. IX, 1(1).

[¶153]   As in *Booth*, the framers of the Wyoming Constitution intended the superintendent, pursuant to Art. 7, § 14, to serve as a conduit of and source for educational information and policy and intended the legislature to have broad but not unlimited authority to delegate the superintendent's powers and duties consistent with this intent.  Although not significantly different from the definition the Colorado court gave the words in *Booth*, the definition we apply to the words "general supervision" at the time Wyoming's constitution was ratified supports the conclusion that the framers contemplated the office would have oversight of the public schools on a statewide basis.  Additionally, as the California court did in the following case, we conclude the framers never intended the superintendent to be in control of education or to prohibit the legislature from defining the general supervisory powers and duties of the office.

[¶154]  In *State Board of Education v. Honig*, 13 Ca. App. 4th 720, 16 Cal. Rptr. 2d 727 (Cal. Ct. of App. 3rd Dist. 1993), the California superintendent challenged the constitutionality of the legislature's designation of the state board of education as "the governing and policy determining body" of the department of education.  *Id.* at 749.  He argued the framers of the state constitution intended the superintendent to be in charge and control of the public school system and department of education and to limit the legislature's plenary authority to define the duties of the superintendent.  *Id.* at 749-50.  He relied on language in the constitution requiring the superintendent to "enter upon the duties of his office" which he argued were already in place in the political code adopted prior to the constitution.  He also relied on the constitutional debates which showed proposed amendments to replace the superintendent with an elected board of education were unsuccessful.  The superintendent argued that the delegates' acceptance of the provision authorizing the holder of the office to "enter upon the duties of his office" and rejection of the proposed amendments to replace the superintendent with a board of education showed the framers intended to deny the legislature authority to enact any law reducing the superintendent's duty to head the department of education and lead the public school system.

[¶155]  The Court rejected the argument, holding "[a]lthough the [superintendent] is a constitutional officer whose office cannot be extinguished by the Legislature, the powers and duties of that office may, and have been, increased and diminished by the Legislature under its plenary authority."  In reaching this result, the court applied three well-established rules of constitutional construction: 1) as the law-making authority of the state, the legislature may exercise any and all legislative powers not expressly or by implication denied to it by the constitution; 2) if there is any doubt as to the legislature's power to act it should be resolved in favor of the action; and 3) where a constitutional provision may have either of two meanings and the legislature has adopted one, its action should be upheld unless it can be positively and certainly said to be unconstitutional.  *Id.* at 751.  Finding that the constitution did not expressly or by implication deny the legislature power to define the superintendent's duties, any doubt should be resolved in

favor of the legislation, and the statute designating the board of education as the governing and policy determining body of the department was not positively and certainly opposed to the constitution, the court upheld the statute.

[¶156] The constitutional provisions at issue in *Honig* were different from those at issue here. The California constitution did not specify that the superintendent was entrusted with general supervision of the public schools but only that the superintendent shall enter upon the duties of the office. Both constitutions, however, provided that the superintendent's duties "shall be prescribed by law." The California court concluded the words "shall enter upon the duties of the office" did not "create a right to take charge of and be in control of the public school system and the Department by virtue of [the] office alone." *Id*. at 750. We likewise conclude the words "shall be entrusted with general supervision of the public schools" did not create a right to be in charge or control of all aspects of education in Wyoming. When read *in pari materia* with the other constitutional provisions requiring the legislature to provide opportunities for education, systems of public instruction and schools and prescribe the superintendent's powers and duties, and when the proper rules of interpretation are applied, Art. 7, § 14 does not grant the superintendent such sweeping authority. Even if it were susceptible to that interpretation, which we conclude it is not, the legislature long ago adopted a different interpretation when it created the department of education and board of education and began the task of dividing the duties necessary to providing the opportunity for education and a complete system of public instruction and schools. Though not conclusive, legislative interpretation of the constitution is entitled to great weight. *Hopkinson v. State*, 664 P.2d 43, 64 (Wyo. 1983), citing *Coronado Oil Co. v. Grieves*, 603 P.2d 406 (Wyo. 1979); *State ex rel. Irvine v. Brooks*, 14 Wyo. 393, 418, 84 P. 488 (1906). It cannot be said that the legislature's interpretation of Art. 7, § 14 is positively and certainly unconstitutional. Rather it is a proper exercise of the legislature's plenary power to address the needs of an educational system that has evolved over more than one hundred years and become ever more complex.

[¶157] One additional case not mentioned in the majority opinion warrants discussion although it did not involve a superintendent. In *Yelle v. Bishop*, 347 P.2d 1081 (Wash. 1959), the state auditor challenged the constitutionality of legislation establishing a new budget and accounting system for state government and transferring certain auditing duties from his office. He argued the transferred duties were historically inherent, implied constitutional duties of the office of state auditor which could not be transferred by the legislature. The state constitution provided in Art. III, § 20:

> . . . The auditor shall be auditor of public accounts, and shall have such powers and perform such duties in connection therewith as may be prescribed by law. . . .

[¶158] The court held the legislation did not violate the constitution, stating:

> the words 'in connection therewith' relate directly to his duty as auditor of public accounts to be fixed by the lawmaking body; that his powers and duties as auditor, by this language, are within the exclusive discretion of the legislature, which may be fixed, enlarged or diminished by that body at any time.

*Yelle*, 347 P.2d at 1086. Stating that the Washington constitution is a limitation upon the powers of the legislature instead of a grant of powers, and "so far as the power of the legislature is not limited by the constitution it is unrestrained", the court concluded Art. III, § 20 could not reasonably be interpreted as limiting the legislature's powers in light of the framers' affirmative direction that the powers and duties of the state auditor shall be as prescribed by law. *Id.* at 1087.

[¶159] *Yelle* is distinguishable from the present case in that the Washington constitution provided for the abolishment of the office of state auditor and the court relied in part on that provision in concluding the office had only statutory powers. *Id.* However, the court's primary focus was Art. III, § 20, requiring the auditor to serve as auditor of public accounts and have such powers and duties "in connection therewith" as may be prescribed law. It was this language that the court interpreted to mean the legislature had exclusive discretion to fix, enlarge or diminish the auditor's powers and duties.

[¶160] Article 7, § 14 of the Wyoming constitution similarly entrusts the general supervision of the public schools to the superintendent while requiring the powers and duties of the office to be prescribed by law. In light of the framers' affirmative directive that the superintendent's powers and duties to generally supervise shall be prescribed by law, we conclude the legislature has exclusive discretion to fix, enlarge or diminish those powers and duties. As long as the superintendent retains general supervision of the public schools, which is the case under SEA 0001, the legislature's delegation of duties involving education must be upheld as a proper exercise of its plenary power.

## CASES CITED BY THE MAJORITY

[¶161] The cases the majority relies on to support its holding are distinguishable. *Hudson v. Kelly*, 263 P.2d 362 (Ariz. 1953) involved an act creating a department of finance, assigning to the department all of the duties of the state auditor and stripping the state auditor of what the court called the inherent duties of his office. In concluding the act was unconstitutional, the court stated:

> Under our system of government, and of the state governments of the United States . . . the offices of governor, secretary of state, state auditor, state treasurer and attorney general, have had a well-understood meaning and [stature]. They are words of long antiquity and in reference to offices occupied by the officers at common law.

*Id.* at 365. The court went on to conclude that the duties of the office of state auditor at common law were those of auditing, adjusting and settling the amount of claims against the state payable out of state funds. *Id.* at 366. The court stated, "From the creation of the office to statehood [the office of state auditor] retained its original status as a free and independent executive office, to audit the accounts of the state." Because the statute at issue essentially transferred the auditor's inherent powers and placed the auditor under the supervision of the new commissioner of finance, the court held it unconstitutional.

[¶162] Notably absent from the Arizona court's list of offices existing at common law and having a well-understood meaning and stature is the office of superintendent. Moreover, unlike the office of auditor in Arizona, the office of superintendent in Wyoming did not retain from its creation in 1869 to statehood the status of a free and independent executive office. To the contrary, the office did not exist when the territory was established, then existed *ex officio* for two years, then did not exist at all for another two years only to be re-established again in an *ex officio* capacity for the fifteen years until statehood at which point the need for the office was still in question at the constitutional convention. Additionally, unlike the statute at issue in *Hudson*, SEA 0001 does not place the superintendent under the supervision of the commissioner of education and does not denude the office of its general supervisory role.

[¶163] *Wright v. Callahan*, 99 P.2d 961 (Idaho 1940) is similarly distinguishable from the present case. As in *Hudson*, the office at issue in *Wright* was the state auditor, the statute under consideration created an office of state comptroller and the question was whether it improperly transferred to the comptroller powers and functions belonging to the constitutionally created office of auditor. In finding the statute unconstitutional, the court concluded it took from the state auditor duties which were vested in the territorial controller and, with the adoption of the state constitution, impliedly vested in the state auditor. The legislature could not, the court said, vest in the statutorily created comptroller powers and duties the constitution had already affixed to the auditor's office.

[¶164] As with *Hudson*, *Wright* reached the conclusion it did based in part upon the fact that the office of auditor retained certain characteristics from its creation until the constitution was adopted – a fact that is not true of the office of superintendent in Wyoming. Additionally, unlike the statute in *Wright*, which apparently transferred the ability to audit the state's accounts from the auditor to the comptroller, SEA 0001 does

not transfer general supervision of the public schools to the director of education. The other cases cited by the majority in support of its position – *State ex rel. Mattson v. Kiedrowski*, 391 N.W.2d 777 (Minn. 1986), *Thompson v. Legislative Audit Comm'n*, 448 P.2d 799 (N.M. 1968) and *American Legion Post No. 279 v. Barrett*, 20 N.E.2d 45 (Ill. 1989) -- likewise involved the office of treasurer or auditor and statutes removing the core duties of the offices. They are not controlling of the issue presented here.

[¶165] The majority also contains a lengthy discussion of two North Dakota cases – *Ex parte Corliss,* 114 N.W. 962 (N.D. 1907) and *Langer v. Totten*, 175 N.W. 563 (N.D. 1919). *Corliss*, decided twelve years before *Langer* and distinguished in the later case, involved a statute creating the appointed office of enforcement commissioner and giving the office authority to appoint deputy commissioners to enforce the prohibition laws when deemed necessary. The court held the statute unconstitutional because it allowed the deputy commissioners to discharge the duties belonging to the elected offices of county sheriff and state's attorney provided for in the constitution. In reaching that result, the court said:

> We do not deny the power of the legislature to prescribe duties for these officers, which power carries with it by implication the right to change such duties from time to time as the public welfare may demand; but we deny its power to strip such offices, even temporarily, of a portion of their inherent functions, and transfer them to officers appointed by central authority.

*Id*. at 965. The court specifically noted that the statute authorized the enforcement commissioner to determine whether the state's attorney and county sheriffs were discharging their duties to enforce the prohibition laws. *Id*. at 964.

[¶166] Subsequently, in *Langer*, the court upheld the constitutionality of a statute creating a board of administration and entrusting it to supervise and control the preparation of courses of study in the public schools. The superintendent challenged the law claiming that it deprived her of powers inherent in the office of superintendent. She cited *Corliss* in support of her position. The Court distinguished *Corliss* on the basis that it involved the office of state's attorney and, while the constitution provided for the election of the state's attorney, it did not provide that the duties of the office would be prescribed by law. Absent language in the constitution concerning the duties, the court concluded the state's attorney's duties were those inherent in the office. In contrast, the constitution provided for the election of the superintendent and specifically authorized the legislature to prescribe the duties of the office. The constitution also authorized the legislature to provide for the establishment and maintenance of a system of public schools and uniform courses of study. Based upon these provisions making the

legislature responsible for the educational system and prescribing the superintendent's duties, the Court upheld the statute, finding that it did not deprive the superintendent of duties inherent in the office.

[¶167] Neither one of these cases is directly on point. *Corliss* involved a statute giving an appointed office the power to determine whether a constitutional office was discharging its duties and, upon determining it was not, discharging them itself. SEA 0001 contains no provision authorizing the director of education to determine whether the office of superintendent is performing its duties nor does it give the director the discretion to perform those duties upon deciding they are not being performed satisfactorily. Moreover, in *Corliss*, the court acknowledged that the legislature's authority to prescribe duties for the offices in question carried with it "the right to change such duties from time to time as the public welfare may demand." It was the act of stripping the offices of their inherent functions and transferring them to an appointed office that the Court determined was prohibited. To reiterate, SEA 0001 does not strip the superintendent of inherent functions but leaves the office with substantial powers and duties constituting general supervision of the public schools.

## CONSEQUENCES OF THE MAJORITY RULING

[¶168] The majority's conclusion that SEA 0001 is unconstitutional raises significant questions and carries with it some serious potential consequences. If Art. 7, § 14 prohibits the legislature from transferring duties from the superintendent to another agency or office, what does that mean about the board of education, department of education, school facilities commission and all of the other entities and offices the legislature has created since 1917 in an effort to satisfy the constitutional mandates? The majority does not explain how the creation of and transfer of duties to the office of director of education is different from, for example, the legislature's creation of the board of education nearly 100 years ago and assignment to it in the ensuing years of substantial duties constituting the very heart of the educational system. If the legislation establishing other entities and offices and assigning them duties is unconstitutional, the entire state educational system is undermined.

[¶169] The majority, Superintendent Hill and the Powers state that the superintendent has "some" implied or inherent powers and duties but do not identify specifically what those powers and duties are. Is the task of assisting the board of education with its duties, which the legislature assigned to the director of education in SEA 0001, an inherent power of the superintendent? If the majority's answer is yes, what does it mean that the board of education was not in existence at the time the constitution was ratified? How can an office have inherent power over something that did not exist? Many of the duties assigned to the director of education involve rule-making for parts of the state educational system that did not exist and could not have been envisioned when the office

of superintendent was created, such as the statewide accountability system, federal funds for school lunches, the school for the deaf, and the education block grant. Other duties assigned to the director involve assisting entities and systems that did not exist when the office of superintendent was created, such as the department of education, the statewide accountability system, the professional teaching standards board, special and vocational education systems and state plans for federal funds. How can any of these duties be inherent in the office of superintendent when they did not exist and could not have been envisioned when the office was created?

[¶170] Similarly, although the majority, Superintendent Hill and the Powers concede that the legislature has plenary power to prescribe the powers and duties of the superintendent and *to remove duties from the superintendent*, they do not identify any powers and duties the legislature in the exercise of its plenary power may properly prescribe or remove. If the legislature cannot validly transfer 68 duties from the superintendent to the director of education, can it constitutionally transfer 45 duties? Or can it only properly transfer two?

[¶171] It is incumbent upon the party claiming a constitutional violation to prove the violation beyond a reasonable doubt. Without identifying at all which powers and duties are inherently the superintendent's and which powers and duties the legislature can properly transfer in the exercise of its plenary power, Superintendent Hill and the Powers have not carried their burden. Similarly, the majority's failure to identify the powers inherent in the office of superintendent and those the legislature may properly transfer leaves the legislature with no direction on how it should proceed to correct the constitutional deficiency the majority finds in SEA 0001. If the legislature transferred half of the duties back to superintendent, would that withstand constitutional challenge? Or would transferring two-thirds of the duties back to the superintendent be required? Where is the line drawn between the constitutional exercise of the legislature's plenary power and legislation that "marginalizes" the superintendent, and who decides? The majority unacceptably leaves these questions unanswered.

## CONCLUSION

[¶172] Treating this matter as one of "very grave importance," *Cahill*, 75 P. at 442, approaching the question with "great caution" and examining the relevant constitutional provisions and challenged statute in every possible aspect, *Schnitger*, 95 P. at 709, this majority cannot reasonably conclude Superintendent Hill and the Powers have met their burden of proving SEA 0001 is unconstitutional beyond a reasonable doubt. The only conclusion the majority can reasonably reach is that the legislature has, in SEA 0001, constitutionally exercised its plenary power over the state educational system as mandated by the framers of the state constitution.

79

Appendix 1, State of Educational System Prescribed by the Legislature.

